**No. 23-1953**

# In the
# United States Court of Appeals
# for the Federal Circuit

PURDUE PHARMA L.P., PURDUE PHARMACEUTICALS L.P.,
RHODES TECHNOLOGIES,

*Plaintiffs-Appellants,*

v.

ACCORD HEALTHCARE, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
District of Delaware, No. 1:20-cv-01362-RGA.
The Honorable Richard G. Andrews, Judge Presiding.

## BRIEF OF DEFENDANT-APPELLEE
## ACCORD HEALTHCARE, INC.

ALEJANDRO MENCHACA
BEN J. MAHON
BRADLEY P. LOREN
McANDREWS, HELD & MALLOY, LTD.
500 West Madison Street
34th Floor
Chicago, Illinois 60661
(312) 775-8000
amenchaca@mcandrews-ip.com
bmahon@mcandrews-ip.com
bloren@mcandrews-ip.com

*Counsel for Defendant-Appellee*




**Representative Patent Claim Pursuant to Federal Circuit Rule 28(a)(12)**

**Abuse Deterrent Patents**

Claims 1 and 3 of U.S. Patent No. 9,775,808 recite:

> 1. A pharmaceutical composition comprising:
>
> at least one active agent comprising oxycodone or a pharmaceutically acceptable salt thereof;
>
> at least one high molecular weight polyethylene oxide (PEO), having an approximate molecular weight of from 1 million to 15 million;
>
> at least one of an additive and a film coating; and optionally at least one low molecular weight PEO having an approximate molecular weight of less than 1,000,000; wherein
>
> (a) the active agent and high molecular weight PEO are combined in a solid oral extended release dosage form that is (i) compression shaped, (ii) air cured by heated air, without compression, for at least about 5 minutes at a temperature above the softening temperature of the high molecular weight PEO, (iii) cooled, and (iv) hardened;
>
> (b) the high molecular weight PEO comprises at least about 30% (by weight) of the dosage form;
>
> (c) the molecular weight of each PEO is based on rheological measurements; and
>
> (d) the total weight of the dosage form is calculated by excluding the combined weight of said film coatings.

* * *

> 3. A pharmaceutical composition according to claim 1, wherein the curing temperature is from about 70° C. to about 85° C. and the curing time is from about 10 minutes to about 10 hours.

Appx302.

**Low ABUK Patents**

Claims 1, 3, and 10-11 of U.S. Patent No. 9,073,933:

> 1. An oxycodone hydrochloride composition which comprises at least 95% oxycodone hydrochloride, 8α,14-dihydroxy-7,8-dihydrocodeinone, and less than 25 ppm of 14-hydroxycodeinone.

\* \* \*

> 3. The oxycodone hydrochloride composition of claim 1, having less than 10 ppm of 14-hydroxycodeinone.

\* \* \*

> 10. A process for preparing an oxycodone hydrochloride composition having less than 25 ppm 14-hydroxycodeinone, comprising removing 8α,14-dihydroxy-7,8-dihydrocodeinone from an oxycodone base composition and converting the oxycodone base composition to an oxycodone hydrochloride composition having less than 25 ppm 14-hydroxycodeinone.

> 11. The process of claim 10, comprising combining hydrochloric acid and the oxycodone base composition in a solvent to form a solution, and isolating the oxycodone hydrochloride composition having less than 25 ppm 14-hydroxycodeinone from the solution.

Appx466.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1953

**Short Case Caption** Purdue Pharma L.P. v. Accord Healthcare, Inc.

**Filing Party/Entity** Accord Healthcare, Inc., Defendant-Appellee

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/13/2023

Signature: /s/ Alejandro Menchaca

Name: Alejandro Menchaca

FORM 9. Certificate of Interest

Form 9 (p. 2)<br>
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Accord Healthcare, Inc. | Intas Pharmaceuticals Limited | Intas Pharmaceuticals Limited |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐     Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Aaron Barkoff<br>formerly at McAndrews, Held & Malloy, Ltd. | Ashley M. Ratycz<br>McAndrews, Held & Malloy, Ltd. | |
| Benjamin J. Schladweiler<br>Greenberg Traurig LLP | Renée Mosley Delcollo<br>Greenberg Traurig LLP | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑    Yes (file separate notice; see below)    ☐    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES .............................................................. vii

TABLE OF ABBREVIATIONS ........................................................... xi

STATEMENT OF RELATED CASES ................................................. xii

STATEMENT OF THE ISSUES .......................................................... 1

INTRODUCTION ............................................................................... 2

COUNTERSTATEMENT OF THE CASE ........................................... 3

I.    Abuse Deterrent Claims ............................................................. 3

    A.    Background ....................................................................... 3

    B.    The proceedings below ..................................................... 4

II.    Low ABUK Claims .................................................................... 4

    A.    Background ....................................................................... 4

    B.    The proceedings below ..................................................... 6

SUMMARY OF THE ARGUMENT .................................................... 8

ARGUMENT ..................................................................................... 10

I.    The district court correctly found the Abuse Deterrent Claims obvious ....... 11

    A.    The district court properly analyzed the evidence of
obviousness ................................................................... 12

        1.    The district court did not err in failing to analyze the
claims as a whole ................................................ 12

            a.    The district court's analysis was proper ...................... 13

            b.    The record contained significant evidence
demonstrating a reasonable expectation of success
at arriving at the claimed invention as a whole ............. 15

        2.    The district court properly addressed modifying
Bartholomaus and McGinity to use heating without
compression ............................................................. 17

iv

a. The district court's finding of a motivation to heat without compression was not clearly erroneous.............17

  i. The district court's motivation finding is not based on an inferential leap...................................18

  ii. The district court considered the effects of heating without compression................................20

  iii. There were only finite options for scalably heating PEO to make a hardened tablet ..............21

b. The district court's finding of a reasonable expectation of success in using heating without compression was not clearly erroneous.........................25

  i. The district court applied the proper standard ................................................................25

  ii. The district court properly found a reasonable expectation of success in arriving at the claimed invention as a whole ....................26

  iii. The district court did not err in finding Bartholomaus's disclosure "supported" a reasonable expectation of success.......................27

3. The district court properly found that the claimed time and temperature limitations were the result of routine experimentation........................................................................30

B. The district court properly addressed the objective indicia and its factual findings were not clearly erroneous ...................................33

1. The district court properly analyzed the objective indicia........33

2. The district court did not clearly err in its factual findings ......34

a. The district court's finding that high sales of Oxycontin® was due to previous market dominance was not clearly erroneous............................35

b. The district court's finding of no industry skepticism was not clearly erroneous .............................39

c. The district court's finding that there was no evidence of failure to achieve the claimed invention was not clearly erroneous ...............................41

v

       d.     The district court's finding that a decrease in density was not an unexpected result demonstrating non-obviousness was not clearly erroneous.................................................................44

II.    The district court correctly found the Low-ABUK claims obvious..............47

    A.    The district court properly applied the flexible test for obviousness outlined in *KSR* ...............................................47

    B.    The district court's factual findings were not clearly erroneous and its conclusion of obviousness was correct...................................51

CONCLUSION .....................................................................56

vi

# TABLE OF AUTHORITIES

## Cases

*Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*,
   25 F.4th 1354 (Fed. Cir. 2022) ...........................................................34

*Allergan, Inc. v. Sandoz Inc.*,
   726 F.3d 1286 (Fed. Cir. 2013) ................................................. 40, 47

*Amgen Inc. v. Sandoz Inc.*,
   66 F.4th 952 (Fed. Cir. 2023) ...........................................................10

*Apple Inc. v. Samsung Elec. Co.*,
   839 F.3d 1034 (Fed. Cir. 2016) .........................................................36

*Application of Peehs*,
   612 F.2d 1287 (C.C.P.A. 1980) .........................................................50

*Application of Ryan*,
   480 F.2d 1388 (C.C.P.A. 1973) .........................................................50

*AstraZeneca LP v. Breath Ltd.*,
   603 F. App'x 999 (Fed. Cir. 2015) ....................................................41

*Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*,
   499 F.3d 1293 (Fed. Cir. 2007) .........................................................10

*Bos. Sci. Scimed, Inc. v. Cordis Corp.*,
   554 F.3d 982 (Fed. Cir. 2009) ...........................................................42

*Bos. Sci. SciMed, Inc. v. Iancu*,
   811 F. App'x 618 (Fed. Cir. 2020) ....................................................36

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
   664 F.3d 922 (Fed. Cir. 2012) ................................................... 28, 32

*Chapman v. Casner*,
   315 F. App'x 294 (Fed. Cir. 2009) ......................................................7

*Ecolochem, Inc. v. S. California Edison Co.*,
   227 F.3d 1361 (Fed. Cir. 2000) .........................................................56

*Eibel Process Co. v. Minnesota & Ontario Paper Co.*,
   261 U.S. 45 (1923)............................................................... 48, 49

*Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*,
   881 F.3d 1354 (Fed. Cir. 2018) .........................................................25

*Endo Pharms. Inc. v. Actavis LLC*,
   922 F.3d 1365 (Fed. Cir. 2019) .........................................................26

*George M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*,
   618 F.3d 1294, 1305 (Fed. Cir. 2010) ....................................... 42, 56

*Google LLC v. Koninklijke Philips N.V.*,
   795 F. App'x 840 (Fed. Cir. 2020) ...................................................23

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966).............................................................................10

*Hoffmann-La Roche Inc. v. Apotex Inc.*,
   748 F.3d 1326 (Fed. Cir. 2014) .......................................................13

*In re Applied Materials, Inc.*,
   692 F.3d 1289 (Fed. Cir. 2012) ................................................. 30, 32

*In re Beattie*,
   974 F.2d 1309 (Fed. Cir. 1992) .......................................................22

*In re Conrad*,
   759 F. App'x 982 (Fed. Cir. 2019) ...................................................51

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*,
   676 F.3d 1063 (Fed. Cir. 2012) .......................................................42

*In re Fulton*,
   391 F.3d 1195 (Fed. Cir. 2004) .......................................................22

*In re Kao*,
   639 F.3d 1057 (Fed. Cir. 2011) .......................................................37

*In re Kross*,
   825 F. App'x 758 (Fed. Cir. 2020) ...................................................32

*In re Magna Elecs., Inc.*,
   611 F. App'x 969 (Fed. Cir. 2015) ...................................................41

*In re NTP, Inc.*,
   654 F.3d 1279 (Fed. Cir. 2011) .......................................................14

*In re OxyContin Antitrust Litig.*,
   994 F. Supp. 2d 367 (S.D.N.Y. 2014) ................................................7

*In Re: Copaxone Consol. Cases*,
   906 F.3d 1013 (Fed. Cir. 2018) .......................................................13

*Institute Pasteur & Univ. Pierre Et Marie Curie v. Focarino*,
    738 F.3d 1337 (Fed. Cir. 2013) ........................................................26

*Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*,
    869 F.3d 1336 (Fed. Cir. 2017) ........................................................12

*Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*,
    456 U.S. 844 (1982).........................................................................28

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
    424 F.3d 1324 (Fed. Cir .2005) ........................................................28

*Kimberly-Clark Corp. v. Johnson & Johnson*,
    745 F.2d 1437 (Fed. Cir. 1984) ........................................................14

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
    688 F.3d 1342 (Fed. Cir. 2012) ........................................................25

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)............................................................ 11, 24, 50

*Leo Pharm. Prod., Ltd. v. Rea*,
    726 F.3d 1346 (Fed. Cir. 2013) ................................................. 47, 49

*Merck Sharp & Dohme Corp. v. Hospira, Inc.*,
    874 F.3d 724 (Fed. Cir. 2017) .............................................. 10, 32, 55

*Miles Lab'ys, Inc. v. Shandon Inc.*,
    997 F.2d 870 (Fed. Cir. 1993) ................................................... 37, 44

*Neptune Generics v. Eli Lilly and Co.*,
    921 F.3d 1372 (Fed. Cir. 2019) ........................................................40

*Novartis AG v. Torrent Pharms. Ltd.*,
    853 F.3d 1316 (Fed. Cir. 2017) ................................................. 37, 41

*Novartis Pharms Corp. v. Watson Labs., Inc.*,
    611 F. App'x 988 (Fed. Cir. 2015) ............................................ 48, 49

*Novartis Pharms. Corp. v. W.-Ward Pharms. Int'l Ltd.*,
    923 F.3d 1051 (Fed. Cir. 2019) ........................................................22

*Novo Nordisk A/S v. Caraco Pharm. Lab'ys, Ltd.*,
    719 F.3d 1346 (Fed. Cir. 2013) ........................................................33

*Orexo AB v. Actavis Elizabeth LLC*,
    903 F.3d 1265 (Fed. Cir. 2018) ........................................................29

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (2006) ................................................................. 37, 44

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) ............................................................24

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) ...................................................... 23, 34

*Pentec, Inc. v. Graphic Controls Corp.*,
776 F.2d 309 (Fed. Cir. 1985) ..............................................................36

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ............................................................33

*Polaroid Corp. v. Eastman Kodak Co.*,
789 F.2d 1556 (Fed. Cir. 1986) ............................................................34

*Purdue Pharma L.P. v. Epic Pharma, LLC*,
811 F.3d 1345 (Fed. Cir. 2016) .......................................................7, 51

*Sanofi-Synthelabo v. Apotex, Inc.*,
550 F.3d 1075 (Fed. Cir. 2008) ............................................................13

*Tokai Corp. v. Easton Enterprises, Inc.*,
632 F.3d 1358 (Fed. Cir. 2011) ............................................................38

*VirnetX Inc. v. Apple Inc.*,
665 F. App'x 880 (Fed. Cir. 2016) ......................................................26

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) ...........................................................39

**Statutes**

35 U.S.C. § 103 ....................................................................................11

# TABLE OF ABBREVIATIONS

| Abbreviation | Meaning |
|---|---|
| 14-hydroxy | 14–hydroxycodeinone |
| 8α | Alpha isomer of 8, 14–dihydroxy–7, 8–dihydrocodeinone |
| 8β | Beta isomer of 8, 14–dihydroxy–7, 8–dihydrocodeinone |
| 8,14-dihydroxy | Collectively 8α and 8β without specifying stereochemistry |
| ABUK | Alpha Beta Unsaturated Ketone |
| Abuse Deterrent Claims/Patents | Claim 3 of US Patent No. 9,763,933; claim 3 of US Patent No. 9,775,808; and claim 6 of US Patent No. 9,763,886. |
| Bartholomaus | U.S. Patent App. Pub. No. 2005/0031546 (Appx9417-9430) |
| Billa | Billa et al., *Diclofenac Release from Eudragit-Containing Matrices and Effects of Thermal Treatment*, 24 PHARMA. DEV. & TECH. 46-60 (1998) (Appx9439-9445) |
| Casner Patent | U.S. Patent No. 7,153,996 (Appx9521-9526) |
| District court | The Honorable Richard G. Andrews of the District court for the District of Delaware |
| Low ABUK Claims/Patents | Claims 3 and 11 of US Patent No. 9,073,933 and claim 21 of US Patent No. 9,522,919 |
| McGinity | U.S. Patent No. 6,588,963 (Appx9408-9416) |
| Omelczuk | Omelczuk & McGinity, *The Influence of Thermal Treatment on the Physical-Mechanical and Dissolution Properties of Tablets Containing Poly(DL-Lactic Acid)*, 10(4) PHARMA. RESEARCH 542-548 (1992) (Appx9446-9452) |
| Oven Art | Shao, Billa, and Omelczuk (Appx9431-9452) |
| PEO | polyethylene oxide |
| ppm | parts per million (for reference 1ppm = 0.0001%) |
| Shao | Shao, et al., *Effects of Formulation Variables and Post-compression Curing on Drug Release from a New Sustained Release Matrix Material: Polyvinylacetate-Povidone*, 6(2) PHARMA. DEV. & TECH. 247-254 (2001) (Appx9431-9438) |

## STATEMENT OF RELATED CASES

Under Federal Circuit Rule 47.5, Appellee Accord Healthcare, Inc., states that this appeal may affect the case *Purdue Pharma L.P. v. Accord Healthcare,* 1:22-cv-00913 (D. Del.), currently pending. Purdue has asserted certain claims of U.S. Patent Nos. 11,304,908 and 11,304,909, both of which are related to patents at issue in this appeal, specifically U.S. Patent Nos. 9,763,933; 9,775,808 and 9,763,886.

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly determined that the Abuse Deterrent Claims are invalid for obviousness.

2.      Whether the district court correctly determined that the Low ABUK Claims are invalid for obviousness.

# INTRODUCTION

The district court correctly found the Abuse Deterrent Claims to be invalid for obviousness. Bartholomaus and McGinity taught the use of heated PEO to form hardened crush-resistant tablets, but used niche or unscalable heating equipment. The court found a POSA would have been motivated to use common scalable heating equipment to melt the PEO with a reasonable expectation of success based on the unrebutted expert testimony from Accord and the Oven Art. The court carefully considered each objective indicium and found each uncompelling. Its findings are well supported by the evidence and not clearly erroneous, and the court properly applied the law. Thus, the district court's legal conclusion of obviousness, based on its substantial fact findings, should be affirmed.

For the low-ABUK Claims, Purdue creates a rigid preventative rule—that where the source of a problem is not previously disclosed in the prior art, claims to the solution of that problem cannot be obvious as a matter of law. That is incorrect. The Supreme Court has consistently eschewed such rules and made clear the obviousness test is expansive and flexible. Here, where unchallenged factual findings show that a POSA was motivated to solve the problem (of 14-hydroxy in oxycodone) and both would have discovered the source disclosed in the patent and solved the problem even without such knowledge, a finding of obviousness is proper. Thus, this Court should affirm.

## COUNTERSTATEMENT OF THE CASE

I.   **Abuse Deterrent Claims**

A.   **Background**

The abuse of oxycodone is well documented. *E.g.*, Appx9401-9407. The art recognized a solution was to make "formulations that deter abuse by resisting crushing and drug extraction with the use of common solvents." Appx9377.

Bartholomaus taught such an oxycodone formulation using heated PEO. *E.g.*, Appx9428 at ¶ 136. This formulation had a high breaking strength, could not be pulverized, and formed a highly viscous gel. Appx9429 at ¶¶ 139-140. In fact, Purdue learned of the ability to use heated PEO with oxycodone from its visits with Grunenthal, the employers of Bartholomaus. Appx5338-5339 (Mannion 305:5-306:16), Appx5363 (Mannion 330:3-18), Appx5365 (Mannion 332:12-18). Purdue licensed the Bartholomaus patents and lists them in the Orange Book for Oxycontin®. Appx5362-5363 (Mannion 329:17-330:5); Appx8325; Appx9611; Appx10490; Appx10641; Appx10667.

Similarly, McGinity teaches using a hot-melt extruder to form tablets comprising melted PEO. Appx9408-9416. While McGinity does not expressly teach that its tablets are hardened, this would have been known to a POSA. Appx5252-5253 (Appel 220:17-221:1).

3

**B.    The proceedings below**

Accord argued that it would have been obvious to take the teachings of Bartholomaus and McGinity of heating PEO to form a hardened tablet, but use common, scalable pharmaceutical equipment such as an oven in order to manufacture such tablets on a commercial scale. Appx9-10. Accord also argued that this would have been within the skill of a POSA using only routine experimentation to determine the optimal times and temperatures necessary. *Id.*

The district court agreed with Accord on both issues. It found that "Dr. Appel presented clear and convincing testimony that ovens were commonly available and used to heat tablets" and "that Defendant presented clear and convincing evidence of a POSA's motivation to modify Bartholomaus and McGinity with the Oven Art." Appx13-14; *see also* Appx9-12. The court then found a POSA would have had a reasonable expectation of success through routine experimentation based on the unrebutted expert testimony of Dr. Appel and the teachings of the Oven Art and Bartholomaus. Appx15-19. The court considered the objective evidence and found it unpersuasive. Appx21-26. It thus found the asserted claims obvious. Appx49.

**II.    Low ABUK Claims**

**A.    Background**

Oxycodone hydrochloride is a well-known molecule and has been synthesized for decades. Appx5066-5067 (Martin 34:7-35:8). The synthesis process involves three steps: (1) oxidation of thebaine to form 14-hydroxy; (2) hydrogenation of 14-

4

hydroxy to form oxycodone; and (3) addition of hydrochloric acid to form a salt. *E.g.*, *id.*; Appx10 (FOF# 10). Each of these steps was well known in the art both as a general chemical reaction and specifically for the manufacture of oxycodone as taught by the primary prior art references Ramanathan, Chiu, and Lin. *E.g.*, Appx5067 (Martin 35:9-25); Appx5643 (Wuest 610:11-19), Appx5647 (Wuest 614:12-15); Appx9503-9513; Appx9514-9515; Appx9516-9520.

The molecule 14-hydroxy is an alpha-beta unsaturated ketone, or ABUK. Appx29 (FOF# 11); Appx5091-5092 (Martin 59:23-60:9). ABUKs are highly reactive and were known to be potentially genotoxic. *Id.* The FDA became concerned about ABUKs like 14-hydroxy, and at least by September 3, 2002, began notifying opioid manufacturers that it would begin requiring the amount of ABUKs such as 14-hydroxy to be under 10 ppm. Appx29 (FOF# 13); Appx8485-8486. The industry thus became interested in forming oxycodone with under 10 ppm of 14-hydroxy. One group to develop such a product was Purdue.[1] However, others also developed such compositions. For example, a group working at Johnson Matthey developed a method of making low 14-hydroxy oxycodone which led to the issuance of U.S. Patent No. 7,153,996 (the "Casner Patent"). Appx9521-9526.

The Low ABUK Patents were the first to report the presence of the molecule 8α in the synthesis of oxycodone. *E.g.* Appx445 Figure 1, Appx450 at 2:3-5.

---

[1] Accord uses "Purdue" to refer to both Purdue and Rhodes collectively.

However, it was known that 8β was formed as a byproduct during the oxidation step. *E.g.*, Appx28 (FOF# 6); Appx5070-5073 (Martin 38:9-41:14); Appx9497-9498. 8α and 8β are isomers of the molecule 8,14-dihydroxy, meaning they have the same chemical formula, but the 3-dimensional arrangement of the atoms is different. Appx30 (FOF# 18). The Low ABUK Patents also disclosed that 8α converted into 14-hydroxy under acidic conditions of salt formation, leading to residual 14-hydroxy in the final product. *E.g.*, Appx450 at 2:6-19. It was also known, however, that 8β could undergo acid-catalyzed dehydration to form 14-hydroxy. Appx28 (FOF# 8); Appx5082-5083 (Martin 50:17-51:3); Appx9499-9502.

### B.    The proceedings below

Accord argued that a POSA would have been motivated to obtain sub 10ppm 14-hydroxy based on FDA notifications to manufacturers, and would have been able to do so through routine development work. Specifically, Accord explained how a POSA would have quickly determined 8α's role in forming residual 14-hydroxy, but would have solved the problem even without such knowledge, based on what was known about 8β. The district court agreed with Accord on all issues.

It found that Accord had "presented clear and convincing evidence that a POSA would have been motivated to modify the prior art process of synthesizing oxycodone to achieve ABUK levels below 10 ppm" based on the FDA notification to manufacturers. Appx39 citing Appx8485-8486.

Then, based on the testimony of Accord's expert Dr. Martin, and the admissions of Purdue's expert Dr. Wuest, the district court found that it would have been within the routine abilities of a POSA to accomplish this goal of a low ABUK level. Appx41-42. It noted that "[a]s far as I can tell, Plaintiffs' reasoning leads to the conclusion that a POSA would simply have given up in the face of 14-hydroxy's reappearance." Appx42. It thus found "Dr. Martin's testimony as to what a POSA would have done more credible" and "because only routine techniques and commonly possessed training would be required" it found "that the POSA would have had a reasonable expectation of success." *Id.*

The court then considered the 8α limitation and was "persuaded by Defendant's evidence that the identification of 8α itself was merely routine." Appx45. It further found "as a factual matter" that "a POSA would have had the knowledge and skill not only to identify 8α and determine its role but also to achieve low-ABUK levels without even identifying 8α." *Id.* The court noted that Purdue presented no objective indicia, and found the challenged claims obvious. Appx49.[2]

---

[2] This Court previously considered the validity of related Low ABUK claims, each time affirming their invalidity over generally the same art presented here. *See Chapman v. Casner*, 315 F. App'x 294 (Fed. Cir. 2009); *In re OxyContin Antitrust Litig.*, 994 F. Supp. 2d 367 (S.D.N.Y. 2014), *aff'd Purdue Pharma L.P. v. Epic Pharma, LLC*, 811 F.3d 1345 (Fed. Cir. 2016).

## SUMMARY OF THE ARGUMENT

The district court properly applied the law, and its findings are not clearly erroneous. Thus, this Court should affirm the obviousness conclusions for both patent families.

Purdue argues that the district court failed to consider the Abuse Deterrent Claims as a whole because it sequentially addressed the only two disputed limitations relating to (1) heating without compression and (2) time and temperature for heating. This Court has repeatedly rejected such arguments, and Purdue relies on inapposite cases where a district court utterly failed to address a meaningful limitation, or combined disparate teachings from references without any rational reason for doing so. Neither error occurred here.

Purdue then argues that the district court erred because there were other possible solutions such as an antagonist. But Purdue ignores both that the law does not require the proposed solution to be the preferred solution and that Bartholomaus and McGinity taught a viable solution of a crush-resistant tablet made by melting PEO. The only question for obviousness was whether a POSA would have been motivated to make the tablets of Bartholomaus and McGinity using scalable equipment with a reasonable expectation of success. And on that question there were only a finite number of predictable solutions as demonstrated by Accord's unrebutted expert testimony and documentary evidence.

8

Purdue then argues that the court erred by addressing whether the time/temperature limitations would have been reached by routine experimentation. But the art provided significant teachings on the proper temperature to use (above the melting point of PEO as taught by Bartholomaus and McGinity) and the times would have been both predictable and easily confirmed by routine experimentation. Thus, the district court correctly applied the law Purdue now cites on appeal.

Purdue then argues that the district court should have credited its objective indicia evidence. But it fails to show clear error. There was ample evidence supporting the court's findings that the sales of OxyContin were due to its existing market share, that the alleged evidence of skepticism and failure did not relate to limitations of the claimed invention, and that the alleged unexpected results did not provide any benefit. This Court should therefore affirm.

For the Low-ABUK claims, Purdue incorrectly argues that where a source of a problem is not previously disclosed, the claims cannot be obvious as a matter of law. There is no support for such a standard, and indeed it is directly contradicted by Supreme Court precedent that the obviousness inquiry is expansive and flexible, unrestrained by rigid preventative rules. The unchallenged factual findings of the district court show that a POSA would have both discovered the source of the 14-hydroxy problem and solved it regardless of such knowledge. The court properly concluded that the Low ABUK Claims were obvious, and this Court should affirm.

**ARGUMENT**

"Obviousness is a question of law, reviewed de novo, based upon underlying factual questions which are reviewed for clear error following a bench trial." *Aventis Pharma Deutschland GmbH v. Lupin, Ltd*., 499 F.3d 1293, 1300 (Fed. Cir. 2007). "The presence or absence of a motivation to arrive at the claimed invention, and of a reasonable expectation of success in doing so, are questions of fact." *Amgen Inc. v. Sandoz Inc*., 66 F.4th 952, 960 (Fed. Cir. 2023). "A factual finding is only clearly erroneous if, despite some supporting evidence, we are left with the definite and firm conviction that a mistake has been made." *Merck Sharp & Dohme Corp. v. Hospira, Inc*., 874 F.3d 724, 728 (Fed. Cir. 2017) (citations omitted).

Purdue misrepresents the obviousness standard, stating that the "fundamental question is whether a POSA would look at the prior art and '*immediately* see that the thing to do was what [the inventor of the patent at issue] did." Br. at 29 quoting *Graham v. John Deere Co.*, 383 U.S. 1, 25 (1966) (emphasis added by Purdue). But the quote Purdue relies on comes ***not*** from *Graham's* description of the test for obviousness (383 U.S. at 17-18), but rather from *Graham's* description of the facts of the case before it. *Id.* at 25 ("Certainly a person having ordinary skill in the prior art…would immediately see that the thing to do was what Graham did, i.e., invert the shank and the hinge plate.").

10

The fundamental question is not whether a POSA would have "immediately" replicated the work of the alleged inventor but whether "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains" based on underlying factual findings. 35 U.S.C. § 103; *Graham*, 383 U.S. at 17-18. This "flexible and expansive" test ensures that "the results of ordinary innovation are not the subject of exclusive rights under the patent laws." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415, 427 (2007).

The district court meticulously applied the *Graham* analysis and correctly found the claims of both patent families to be invalid for obviousness.

## I.    The district court correctly found the Abuse Deterrent Claims obvious

As detailed above, the district court found that the prior art disclosed each and every element of the claims at issue including heated PEO and that a POSA would have been motivated to heat the PEO formulations in an oven and through routine optimization determine the optimal times and temperatures necessary. Purdue argues that the district court erred in finding a motivation to use an oven to heat the prior art PEO formulations and reasonable expectation of success to optimize the time and temperature in the oven, and in evaluating the objective indicia. The court committed no such error. Therefore, this Court should affirm its conclusion of obviousness.

11

**A.     The district court properly analyzed the evidence of obviousness**

Instead of challenging the district court's very simple and straightforward *Graham* findings as being clearly erroneous, Purdue argues that the court committed "legal error" for (1) separately addressing the heating without compression and time/temperature limitations, (2) finding a motivation to heat without compression and a reasonable expectation of success in doing so despite the alleged availability of other abuse-deterrent options, and (3) relying on routine experimentation in determining that the claimed time and temperature limitations would have been obvious. None have merit.

**1.     The district court did not err in failing to analyze the claims as a whole**

Purdue first argues that "the district court improperly divided the obviousness inquiry into separate pieces, rather than considering the closely interrelated claim limitations collectively." Br. at 32. But "there are practical limitations of legal analysis and writing" and a "court's opinion must be linear and cover only one issue at a time." *C.f. Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336, 1358 (Fed. Cir. 2017) (Reyna, J., dissenting). That the court addressed the limitations separately does not mean that the court did not consider the claims "as a whole" as this Court has consistently recognized.

### a.    The district court's analysis was proper

Purdue does not cite a single case finding an analysis such as the district court's to be error. That is because this Court has repeatedly rejected arguments such as Purdue's under nearly identical scenarios.

For example, in *In Re: Copaxone Consol. Cases*, 906 F.3d 1013 (Fed. Cir. 2018), this Court did not "find merit in Teva's argument" that the district court erred because it "separately analyzed the 40mg dose limitation and the 3x/week limitation, without considering them together 'except to conclude that the mash-up would be obvious to try.'" *Id.* at 1026. It noted that a similar analysis had been performed in another case in which the "court first discussed how the prior art taught that infrequent dosing, such as monthly dosing, was preferred" and "then separately discussed why a POSITA would have selected a 150mg dose, before considering the limitations together and concluding that '[a]t the very least, the 150mg dose was obvious to try.'" *Id.* at 1027 citing *Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326 (Fed. Cir. 2014). "[Purdue] makes no convincing argument why a similar approach is inappropriate here." *Id.*

In contrast, none of Purdue's cites cases remotely address the situation here. *See* Br. at 32. In *Sanofi-Synthelabo v. Apotex, Inc*., 550 F.3d 1075 (Fed. Cir. 2008) (distinguished by *Copaxone*), this Court affirmed a district court's conclusion that claims to a particular enantiomer of a compound were non-obviousness because the

"district court thoroughly discussed the many issues and arguments raised by" the appellant and found that the benefits of the enantiomer were unexpected. *Id.* at 1090. In *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437 (Fed. Cir. 1984), this Court found error because "the essential [element] of the claimed invention seems to have been lost sight of by the trial court in its discussion of obviousness." *Id.* at 1448. Specifically, the trial court treated the claims as if they covered any adhesive rather than a specific adhesive serving dual functions, "a concept totally lacking in Champaigne, or in any other prior art reference, which is why the PTO allowed [the] claims." *Id.*

In *In re NTP, Inc.*, 654 F.3d 1279 (Fed. Cir. 2011), the Federal Circuit found that the PTAB engaged in improper hindsight because the petitioner's reliance on the second reference would have rendered a portion of the first reference superfluous. *Id.* at 1298-99. The "piecemeal" analysis this Court took issue with was ***not*** that the court addressed limitations in separate sections of its opinion, but that the "Board improperly relied on hindsight reasoning to piece together elements to arrive at the claimed invention" without any rational reason to do so. *Id.* Here, the court did not draw different elements from disparate references with no rationale— it carefully analyzed two limitations in separate sections of its opinion. That is not legal error.

b.    **The record contained significant evidence demonstrating a reasonable expectation of success at arriving at the claimed invention as a whole**

Purdue asserts that "the record lacked evidence that a POSA *would* expect any particular times and temperatures to succeed using a never-before-tested process." Br. at 33 citing Appx5431 (Bley 398:8-14). But that is demonstrably incorrect.

First, there was significant evidence that a POSA would have expected success, most notably in "Dr. Appel's credible testimony"—which was the only evidence "about a POSA's" expectations. Appx17; *see also* Appx19 ("I am persuaded by Dr. Appel's testimony that testing the curing procedure for various periods of time is simple and routine"). Dr. Appel testified that heating options such as ovens and pan coaters were well known. Appx5260-5261 (Appel 228:7-229:11). She testified that this was shown by the Oven Art, which experimented with different times and temperatures similar to the broad ranges in the claims. *See* Appx5261-5264 (Appel 229:12-232:16); *see also* Appx9431-9438 (Shao teaching curing matrix tablets in oven at 60° C "for varying lengths of time from 10 minutes to 18h" resulting in hardened tablets); Appx9441 (Billa heating tablets in an oven at 60° C for 24, 48 and 96 h); Appx9447 (Omelczuk heating tablet in an oven for 24 hr at 40°, 60° and 80°).

Dr. Appel then explained how a POSA would have determined the time and temperature necessary to air cure a tablet with heat in an oven. Appx5264-5267

15

(Appel 2:32:21-235:2); *see also* Appx5271-5278 (addressing the claims specifically). Finally, she explained how there was nothing surprising about the ranges. Appx5279 (Appel 247:3-20). Based on all of this analysis, Dr. Appel summarized unequivocally that a person of skill would have expected success in making the formulations of the asserted claims using commonly available, every day equipment such as ovens. Appx5279 (Appel 247:21-25), Appx5281-5282 (Appel 249:16-250:5).

That testimony was unrebutted by Purdue's expert. Indeed, even in the testimony cited by Purdue, Dr. Bley did not dispute the fact of a reasonable expectation of success, but simply said he disagreed with Dr. Appel because "it seems like a very hindsight-driven analysis." Appx5431 (Bley 398:5-25). But this conclusory legal argument does not show clear error, especially given that the cited expert admitted he was "not someone who can go into the lab and put all the pieces together" (Appx5472) and had never formulated an extended-release matrix tablet (Appx5473-5474). Far from being "no evidence," there was significant and well-supported unrebutted expert testimony a POSA would have expected success.

**2.     The district court properly addressed modifying Bartholomaus and McGinity to use heating without compression**

Purdue next argues that the district court's analysis of motivation to combine and reasonable expectation of success "was also legally flawed on its own terms." Br. at 34. Purdue is again incorrect.

As a preliminary matter, citing to *Graham,* Purdue argues that "Accord failed to show by clear and convincing evidence that a POSA would 'immediately see,' ... that the *oven art*…solved the problem" of creating a scalable method of heating. Br. at 34. But as explained *supra,* Purdue misrepresents the law of obviousness, which has no "immediately see" requirement. The court properly addressed the actual law, whether a POSA would have been motivated to combine the references with a reasonable expectation of success, and its factual findings are not clearly erroneous.

**a.     The district court's finding of a motivation to heat without compression was not clearly erroneous**

The district court credited unrebutted expert testimony from Dr. Appel that a POSA would have been motivated to use common, scalable pharmaceutical equipment to heat PEO. That testimony fully supports the court's finding of a motivation to combine.

17

### i.     The district court's motivation finding is not based on an inferential leap

Purdue first takes a single quote from the district court that "it 'is *not much of a leap to infer* that ovens would also be useful for applying heat to harden' PEO tablets" and argues this was "critical to the court's finding of obviousness." Br. at 34 citing Appx13 (emphasis added by Purdue). But this statement was merely a shorthand summary of what the evidence established. It was not the "critical" basis for the court's motivation finding.

Rather, the district court evaluated all of the evidence from both sides and found that Accord "presented clear and convincing evidence of a POSA's motivation to modify Bartholomaus and McGinity." Appx13. The court first rejected Purdue's argument that the successful hardening of tablets in Bartholomaus and McGinity "would be a POSA's ending point" because it "fails to address the crux of" Accord's argument that "while the processes were successful for 'one-off tablets'… a POSA would have sought a process that could be scaled up." Appx11 citing Appx5260-5261 (Appel 228:20-229:7). The court noted that Accord's arguments for a motivation to combine went unrebutted because "Plaintiffs do not make a plausible argument that a POSA would not want to develop a scalable process" or "that a POSA would have options other than modifying Bartholomaus and McGinity if they wanted to produce hardened tablets at scale." Appx11-12. Thus, it found "while it is

true that Bartholomaus and McGinity's processes resulted in hardened tablets, I find that a POSA would not stop at their teachings." Appx12.

The court was then "convinced by Dr. Appel's testimony that a POSA would seek a commercially viable process for producing hardened tablets" and "that Dr. Appel presented clear and convincing testimony that ovens were commonly available and used to heat tablets." Appx13. It noted that "Plaintiffs' witnesses did not provide any testimony to the contrary" and "did not attempt to show, for example, that a POSA would not have access to ovens, or that other equipment would be a more natural choice than ovens." Appx13.

The court then discussed how the "Oven Art taught the use of ovens to heat matrix tablets made from several different polymers" and that "Shao specifically taught that the heat curing made its tablets harder." *Id.* It then found that "[w]hile the Oven Art does not teach heating tablets to their melting points, Bartholomaus and McGinity both teach hardening PEO by heating it to its melting point" and "Dr. Appel credibly testified that a POSA…would seek the same result in an oven." Appx13-14.

Thus, far from relying on a "naked inference" (Br. at 34), the court's factual finding of a motivation to modify Bartholomaus and McGinity to use ovens was founded on clear and convincing unrebutted evidence from a qualified expert, supported by documentary evidence.

### ii.    The district court considered the effects of heating without compression

Purdue then argues "the court failed to address the effect of heating 'without compression' or to consider why prior artisans had all heated PEO with compression." Br. at 35 citing Appx13. But that is demonstrably wrong.

First, Purdue's argument that "prior artisans had all heated PEO with compression" (Br. at 35) is incorrect. Bartholomaus *does* provide an example of heating PEO without compression, and finds it gives the same results as heating with compression. Appx9427 at ¶ 121 ("300 mg portions of the powder mixture from Example 1 were heated to 80° C, and in [sic, then] placed in the die of the tableting tool. Pressing was then performed. The tablet exhibits the same properties such as the tablet in Example 1."), ¶ 116 (showing components of example 1 including 200 mg of polyethylene oxide); *see also* Br. at 43 (acknowledging Bartholomaus teaches "prior heating" "in the context of PEO"). Bartholomaus also suggested the use of subsequent heating. Appx9423 at ¶¶ 65, 67.

And the court carefully considered Purdue's arguments including that "ovens had only been used to heat polymers other than PEO." Appx13. Nor is there any evidence "Dr. Appel… ignored the significant change from simultaneous heating and compression to heating without compression and focused only on the 'tool' for heating." Br. at 35. Instead, Purdue simply assumes without evidence that this change was "significant" (without addressing the example from Bartholomaus

20

above) and then faults Dr. Appel for disagreeing with Purdue's assumption.[3] To the extent Purdue is arguing that Dr. Appel testified only that a POSA "could" use an oven, it simply ignores Dr. Appel's clear and unequivocal testimony that a POSA would have been motivated to modify the method of Bartholomaus "if they wanted to make anything other than, you know, one-off tablets." Appx5260 (Appel 228:20-25); *see also* Appx5261 (Appel 229:3-7). Both Dr. Appel and the district court considered Purdue's arguments—they simply rejected them.

### iii. There were only finite options for scalably heating PEO to make a hardened tablet

Purdue next argues that the district court's analysis was flawed because there was allegedly an infinite number of solutions and it improperly invoked an "obvious-to-try" analysis. In addition to applying an incorrect legal analysis, Purdue simply ignores that Bartholomaus and McGinity already taught the solution of forming a hardened tablet. Thus, a POSA did not need to start from scratch, but only to determine how to develop a scalable process for heating the PEO. On that question, the record showed only a few, finite options—ovens, pan coaters, and fluid bed dryers—each of which would have been obvious.

---

[3] As discussed below when addressing reasonable expectation of success, the district court did consider the only evidence of alleged difficulties in heating PEO without compression, but found them unconvincing because they came not from an expert explaining the concerns of a POSA or any documentary evidence, but from the inventor himself. *See infra* § b.3.; Appx17.

21

Purdue argues "[t]here were several potential techniques for addressing the abuse of opioids aside from physically strengthening tablets." Br. at 36. But the fact that there were several potential techniques is irrelevant because the law does not require the solution to be the "preferred, or the most desirable" solution in order to find the claimed invention obvious. *In re Fulton,* 391 F.3d 1195, 1200 (Fed. Cir. 2004) ("'[T]he question is whether there is something in the prior art as a whole to suggest the *desirability*, and thus the obviousness, of making the combination,' not whether there is something in the prior art as a whole to suggest that the combination is the *most desirable* combination available.") quoting *In re Beattie*, 974 F.2d 1309, 1311 (Fed. Cir. 1992) (emphasis in original).

Purdue further argues that the "evidence provides no reason, much less clear and convincing one, as to why a POSA would have started with physical abuse deterrence among the many options available." Br. at 40. But this Court has recognized that there is no such "starting point" analysis, rather the "proper inquiry is whether a person of ordinary skill would have been motivated to modify the prior art" as proposed. *Novartis Pharms. Corp. v. W.-Ward Pharms. Int'l Ltd.*, 923 F.3d 1051, 1060 (Fed. Cir. 2019) ("To the extent the district court required a showing that a person of ordinary skill would have selected everolimus over other prior art compounds, it erred.").

Therefore, Purdue's suggestion that "an antagonist is the preferred method to reduce abuse" (Br. at 38) is irrelevant and the district court correctly recognized that the evidence presented by Purdue and its expert Dr. Bley at best "support[s] the viability of the antagonist route, but does not undermine the viability of the hardness route." Appx14; *see also PAR Pharm., Inc. v. TWI Pharms., Inc.,* 773 F.3d 1186, 1197-98 (Fed. Cir. 2014) ("Par also argues that there were better methods available to address the viscosity and interpatient variability concerns with Megace OS. Our precedent, however, does not require that the motivation be the best option, only that it be a suitable option from which the prior art did not teach away.") (emphasis in original).

The number of options generally for solving abuse-deterrence is not the proper inquiry for whether it would have been obvious to try an oven—rather it is the number of options *for heating PEO. See Google LLC v. Koninklijke Philips N.V.,* 795 F. App'x 840, 844 (Fed. Cir. 2020) (patentee's argument about number of potential options in the field generally "shifts the inquiry improperly as a legal matter" because "the obvious-to-try inquiry at least sometimes must focus on known options at what is undisputedly the sole point of novelty in the claim at issue.").

The only alleged novelty here was the method of heating the PEO. Appx10-11. Thus, the only issue for a POSA was how to heat the tablets of Bartholomaus (or McGinity) using a scalable process. And on that issue, there were finite options—

ovens, pan coaters, and fluid bed dryers. *See, e.g.*, Appx5251 (Appel 219:14-19), Appx5260 (Appel 228:7-19). Indeed, as the court noted, Purdue "did not attempt to show, for example…that other equipment would be a more natural choice than ovens for heating tablets." Appx13.[4] Thus, there were "a very small number of possible" options. *See* Br. at 36 citing *KSR*, 550 U.S. at 420-21; *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008). And the court's statement that "[a]t the very least, in the absence of testimony about other heating tools, employing a commonly available tool to apply heat to tablets as obvious to try" (Appx13) was a correct application of the law.

---

[4] Purdue briefly tries to argue that a POSA would "face a range of questions, including which ingredients to use for the tablet, the quantity of those ingredients, the manner in which the tablet should be designed [ ] and the process for making the tablet." *See* Br. at 38-39 citing Appx5352 (Mannion 319:13-25). First, in the cited testimony, Purdue's inventor Dr. Mannion merely described "Purdue's manufacturing process of reformulated OxyContin," (Appx5352 (Mannion 319:13-25))—he said nothing about any questions a POSA would have to address in modifying Bartholomaus or McGinity to scalably produce tablets (nor could he as he was not offered as an expert). Second, Purdue again ignores that Bartholomaus already provides all of those answers, i.e., the ingredients to use and in what amounts. *See* Appx9428 at ¶¶ 136-140.

**b.    The district court's finding of a reasonable expectation of success in using heating without compression was not clearly erroneous**

Purdue similarly argues that the district court erred in addressing reasonable expectation of success, but again does not challenge the factual findings as being clearly erroneous. None of its alleged "legal errors" holds water.

**i.    The district court applied the proper standard**

Relying on semantics, Purdue first argues that the district court "lowered the burden of proof established by this Court's decisions." Br. at 41. Not so. The court clearly laid out the correct standard: "whether a POSA would have had a 'reasonable expectation of success' in 'achieving the claimed invention.'" Appx15 citing *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012). And after considering the evidence the court found "there was clear and convincing evidence that a POSA would reasonably expect to produce hardened tablets by heating PEO tablets to their melting points in an oven." Appx18; *see also* Appx19 ("Defendant offered clear and convincing evidence that a POSA would be motivated to combine the references and would have had a reasonable expectation of success in doing so.").

Purdue "improperly attempts to create legal error by selectively quoting from a portion" of the opinion. *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1359 (Fed. Cir. 2018) ("we will not find legal error based upon an isolated

statement stripped from its context"); *Endo Pharms. Inc. v. Actavis LLC*, 922 F.3d 1365, 1378 (Fed. Cir. 2019) (finding no error analyzing reasonable expectation of success where "the District Court articulated the proper legal standard"); *VirnetX Inc. v. Apple Inc.*, 665 F. App'x 880, 886 (Fed. Cir. 2016) (rejecting argument court erred in anticipation by using term "substantial difference" because it did not say a "'substantial differences' test controlled its inquiry").

It is readily apparent the district court (one of the most experienced patent trial judges in the country), correctly applied the well-known law on reasonable expectation of success.

> ii. **The district court properly found a reasonable expectation of success in arriving at the claimed invention as a whole**

Next, Purdue repeats its arguments that the court erred by separately addressing the heated without compression and time/temperature limitations. And again, its caselaw is inapposite. In *Institute Pasteur & Univ. Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337 (Fed. Cir. 2013), the Board ignored prior art that taught that the proposed solution to genetically engineering a cell would be highly toxic which "would bear heavily on whether a skilled artisan would have a reasonable expectation of success…." *Id.* at 1346. The Board did so by saying the claims do not expressly require that the "cells remain viable." *Id.* But this Court recognized that "continuing viability was implicit in the claims at issue" and the Board "identified

no reason at all that a skilled artisan would have pursued a method toxic to cells." *Id.* That is not the situation here—production of the prior art tablets, heated differently.

### iii. The district court did not err in finding Bartholomaus's disclosure "supported" a reasonable expectation of success

Purdue next argues that the district court erred in crediting Bartholomaus's teaching that subsequent heating could be used. But this was not the basis for the court's finding or "critical" to a reasonable expectation of success. *See* Section I.A.1.b. *supra* (laying out evidence in detail). Instead, it simply supported the expert testimony and documentary evidence.

As described above, Bartholomaus provides an example of a PEO/oxycodone formulation that achieves an extended release profile, increased breaking strength, and gel formation. *See* Appx9428 at ¶¶ 136-140. While this specific example uses heating with compression, Bartholomaus states that heating may be applied prior to or subsequent to compression. Appx9423 at ¶¶ 65, 67. And Bartholomaus provides an example of heating with PEO prior to compression. Appx9427 at ¶ 121. Thus, while not the basis for the court's finding, Bartholomaus *supports* the court's finding of a reasonable expectation of success.

But the basis of the court's finding was that it was "persuaded by Dr. Appel's testimony that a POSA would understand that applying heat to melt PEO would

27

cause it to harden." Appx16. The court also considered the ***only*** evidence Purdue

offered that heating PEO without compression was expected to be challenging, but

discounted it because it was not expert testimony from a POSA. Specifically, the

court stated "I do not think that Dr. Mannion's testimony about his own expectations

outweighs Dr. Appel's testimony about a POSA's." Appx17. It further noted that

Dr. Mannion's alleged concerns did not "seem likely given Dr. Appel's credible

testimony." Appx17.

Crediting Accord's expert testimony, let alone expert testimony unrebutted by

any expert or independent evidence, is not clear error. *See, e.g.*, *Inwood Lab'ys, Inc.

v. Ives Lab'ys, Inc.*, 456 U.S. 844, 856 (1982) ("Determining the weight and

credibility of the evidence is the special province of the trier of fact."); *JVW Enters.,

Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1334 (Fed. Cir .2005)

("[C]redibility determinations by the trial judge can virtually never be clear error.")

(citations omitted); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed.

Cir. 2012) ("This court sees no error in the district court's reliance on Celsis'

unrebutted expert testimony."). Nor was it error to credit Dr. Appel over testimony

of the inventor. Indeed, this Court has cautioned against crediting unsupported

inventor testimony. *C.f. Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171-72

(Fed. Cir. 2006) ("[e]ven the most credible inventor testimony is *a fortiori* required

to be corroborated by independent evidence").

Again, Purdue's cases are wholly inapposite. In *Orexo AB v. Actavis Elizabeth LLC*, 903 F.3d 1265 (Fed. Cir. 2018), this Court reversed an obviousness finding because the "benefits [of using citric acid] were not predicted or suggested in any reference" (*id.* at 1271) and the "record does not contain clear and convincing evidence of a teaching or suggestion to use citric acid particles as a carrier for this opioid product in substitution therapy." *Id.* at 1273. Here, the benefits of using an oven or pan coater for scalability were uncontested. *See* Section I.A.2.a. *supra.*

Because it has no evidence that modifying Bartholomaus and McGinity would have been challenging, Purdue attacks Bartholomaus's teachings in isolation, arguing that its teaching of subsequent heat "is one of *thousands* of permutations implicit in Bartholomaus, which mentions more than 100 active agents, 9 polymers, and 3 different heating possibilities." Br. at 44 (emphasis in original). But this is again a red herring. Bartholomaus's **examples** exclusively teach the use of PEO, including heating PEO without compression, as well as using oxycodone. Thus, a POSA did not need to pick and choose from the disclosure of Bartholomaus to arrive at the claimed invention, a POSA needed only to change the heating in this example—which Bartholomaus itself suggests can be done.

The district court did not clearly err in finding that this suggestion in Bartholomaus, **in addition** to substantial expert testimony, as well as the Oven Art showing use of ovens to heat other extended-release matrix tablets, showed that a

POSA would have had a reasonable expectation of success in using an oven to heat the formulations disclosed in Bartholomaus and McGinity.

### 3. The district court properly found that the claimed time and temperature limitations were the result of routine experimentation

Purdue argues that the district court committed legal error by finding that the claimed time and temperature limitations were the result of routine experimentation because there "are innumerable possible 'time and temperature' combinations, and no obvious place to start." Br. at 46. But contrary to Purdue's assertions, this is precisely the case where "the general conditions of a claim are disclosed in the art." Br. at 45 citing *In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012).

Regarding temperature, the prior art taught heating the polymer PEO at temperatures above its melting point, including well within the claimed ranges of 60-90° C. *E.g.*, Appx9427 at ¶ 117 (Bartholomaus example heating PEO to 80°C); *see also* Appx9423 at ¶ 67 (Bartholomaus teaching heating "to at least the softening temperature" e.g., "melting temperature"); Appx9416 at 13:4-8 (McGinity teaching the "solid mixture may then be passed through the heated extruder at a temperature range of about 75°C to about 130°C… so that melting or softening of the PEO occurred").

Dr. Appel explained that, consistent with those teachings, a POSA would have understood that "[i]f it's too hot, it may result in drug degradation" and "polymer

degradation" and if it is "[n]ot hot enough – it's not going to melt or soften the material." Appx5265 (Appel 233:3-17). Dr. Appel further explained that the melting point of PEO was known to be around 60° (depending on the molecular weight), and a POSA would have known to start with a temperature above this melting temperature (Appx5244-5245 (Appel 212:23-213:19)). Thus, the general heating conditions recited in the claims were indisputably well known in the art which provided, at the very least, a starting point.

With respect to time, Dr. Appel explained "you certainly have to allow for heat transfer" compared to the times in Bartholomaus and McGinity and would try to find a range of times that worked so as to be workable in a manufacturing facility, i.e., minutes to hours. Appx5265-5267 (Appel 233:18-235:2). And those times were consistent with the heating of other polymers using ovens in the prior art. Appx9431-9438 (Shao teaching curing matrix tablets in oven at 60° C "for varying lengths of time from 10 minutes to 18h" resulting in hardened tablets); Appx9441 (heating tablets in an oven at 60° C for 24, 48 and 96 h); Appx9447 (heating tablet in an oven for 24 hr at 40°, 60° and 80°).

Thus, the temperature was known, and the general time range was known and could be determined by simple experiments as shown in the Oven Art. "That is a far cry from impermissibly requiring that a skilled artisan, without any guidance from the prior art, 'vary all parameters' until one succeeds." *In re Kross*, 825 F. App'x

758, 762 (Fed. Cir. 2020); *see also Applied Materials, Inc.,* 692 F.3d at 1297 ("Nothing indicates that the optimization of the variables was anything other than the exercise of ordinary skill in the art."). And "it was reasonable for the district court to deduce from the evidence" that the time/temperature ranges "if not already known, would have been discovered by routine experimentation while implementing known principles." *Merck,* 874 F.3d at 729-30. "The court's analysis thus involved no legal error." *Id*.

The district court properly weighed and credited Dr. Appel's testimony that testing the curing procedure for various periods of time is simple and routine stating that her testimony "aligns with common sense." Appx17, Appx19. Nor is there any evidence that the recited times and temperatures are critical or unexpected. *See Applied Materials*, 692 F.3d at 1297 ("The outcome of optimizing a result-effective variable may still be patentable if the claimed ranges are 'critical' and 'produce a new and unexpected result which is different in kind and not merely in degree from the results of the prior art.'") (citation omitted).

Thus the court applied the correct legal framework, and properly credited unrebutted expert testimony. Purdue cannot show clear error. *See Celsis*, 664 F.3d at 930.

**B.**     **The district court properly addressed the objective indicia and its factual findings were not clearly erroneous**

The district court properly applied the law on objective indicia, which it clearly and accurately articulated. It then carefully addressed the objective indicia in a detailed analysis that was not clearly erroneous.

**1.**     **The district court properly analyzed the objective indicia**

While Purdue argues that the "the court asked only whether the objective considerations 'undermine' an existing finding of obviousness." Br. at 47 (citing Appx21-22), the court clearly explained that it understood "that the burden of persuasion on the ultimate question of obviousness" does not transfer "to the proponent of the secondary consideration." Appx20 citing *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). Thus, the district court properly applied the law and did not shift the burden to Purdue to "rebut" a conclusion of obviousness. *See Novo Nordisk A/S v. Caraco Pharm. Lab'ys, Ltd.*, 719 F.3d 1346, 1353-54 (Fed. Cir. 2013) ("The mere fact that the court conducted [its] analysis using terms such as 'overcome' and 'prima facie' does not necessarily imply that it shifted the burden of persuasion to Novo.").

The district court carefully considered all of the objective indicia (Appx20-26) before issuing its legal conclusion (Appx49). Thus, "it is clear that the district court did consider the objective indicia before reaching its ultimate obviousness

33

conclusion, which is what our precedent counsels." *PAR*, 773 F.3d at 1199. Indeed, in *Par*, this Court rejected an argument nearly identical to Purdue's:

> [The patentee] first objects to the fact that the district court turned to these indicia only after concluding that [it] 'has proved by clear and convincing evidence a prima facie case of obviousness.' We are unpersuaded that the legal framework employed by the district court was improper."

*Id.*; *see also Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*, 25 F.4th 1354, 1372 (Fed. Cir. 2022) ("it is evident from the district court's opinion that it considered all of the evidence on the issue of obviousness, including the objective indicia of nonobviousness, in coming to its ultimate legal conclusion. Although the district court's analysis of the objective indicia in the opinion follows its discussion of the prima facie case of obviousness, there is nothing inherently wrong with that.").

## 2.    The district court did not clearly err in its factual findings

"[T]he existence of and weight assigned to any objective indicia of nonobviousness are underlying factual questions we review for clear error." *Adapt*, 25 F.4th at 1364. Purdue does not show clear error. Instead, Purdue presents its evidence, and asks this Court to reach a different conclusion. That is not this Court's role as an appellate tribunal. *See, e.g., Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1558 (Fed. Cir. 1986) ("Because we do not retry the case, Kodak must to prevail convince us that the judgment cannot stand on the record created at trial, i.e., that the judgment rests on such fundamental error as to compel reversal…It is

therefore ineffective on appeal to merely present a scenario in which the trial judge could have gone appellant's way.") (citations omitted).

> ### a. The district court's finding that high sales of Oxycontin® was due to previous market dominance was not clearly erroneous

First, Purdue argues that the district court "attributed reformulated OxyContin's commercial success to Purdue's purported 'existing monopoly' without citation to any record evidence." Br. at 51 citing Appx23. That is incorrect.

The district court clearly stated that "Based on the testimony of Plaintiffs' and Defendant's experts, I cannot conclude that reformulated OxyContin's commercial success was the result of anything other than Purdue's existing monopoly."[5] Appx23. Specifically, Purdue cited testimony from "Defendant's expert, Mr. Ivan Hofmann" which "noted that the new formulation replaced the original formulation, with all sales transferred to the new formulation." Appx23 citing Appx5686 at 653:3-9. Purdue's expert agreed. Appx5425 (Sharma 392:4-397) ("THE COURT: I mean, basically, people who were taking OxyContin without tamper resistant kind

---

[5] Purdue appears to take issue with the use of the term "monopoly" arguing "while Purdue had patented a particular extended-release formulation of OxyContin, Purdue had *no* existing monopoly on oxycodone products more broadly" and "any competitor could have introduced its own abuse-deterrent formulation and existing market forces provided every incentive to do so." Br. at 51. But the district court's reference to "monopoly" is properly understood to mean Purdue's dominant position in the market prior to its new formulation.

of just shifted over to taking it with tamper resistant; right? [Purdue's Expert Mr. Sharma]: Yeah."). Moreover, the district court properly noted that Purdue's expert "admitted on cross-examination that he did not specifically consider the claimed features of OxyContin." Appx23 citing Appx5414-5415 (Sharma 382:15-383:5). The court also noted that "there was no demonstrated increase in the success of OxyContin relative to other opioids when the patented features were introduced." Appx23.

Thus, the district court did not clearly err in finding sales numbers of OxyContin unpersuasive. *See, e.g.*, *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 316 (Fed. Cir. 1985) ("Because GC was clearly the market leader well before the introduction of the [invention to the marketplace], its sales figures cannot be given controlling weight in determining the effect of commercial success in this case on the question of obviousness."); *Bos. Sci. SciMed, Inc. v. Iancu*, 811 F. App'x 618, 628 (Fed. Cir. 2020) (substantial evidence supported determination that "objective evidence lends minimal support to a conclusion of non-obviousness" where the patentee "did not overcome evidence that Sapien 3's commercial success was a result of [] pre-existing, dominant market share."). Indeed, Purdue does not cite a single case in which this Court found such a finding clearly erroneous.

Instead, Purdue cites to *Apple Inc. v. Samsung Elec. Co.*, 839 F.3d 1034, 1055-56 (Fed. Cir. 2016) (en banc). But there the Court affirmed a jury verdict because

the "record overall contains substantial evidence of a nexus between the slide to unlock feature and the iPhone's commercial success, and we are required to give this jury fact finding deference." *Id.* at 1056. It specifically noted "[i]t is not our role to reweigh the evidence or consider what the record might have supported." *Id.* That the jury there, on different facts, reached a different conclusion does not demonstrate clear error here. *E.g.*, *Miles Lab'ys, Inc. v. Shandon Inc.*, 997 F.2d 870, 874 (Fed. Cir. 1993) (where a court "chooses one of two permissible views of the evidence, it has committed no clear error.").

Second, Purdue argues that preventing commercial failure is the same as commercial success. Br. at 52. But it cites no authority for such a holding. That adding ***any*** abuse-deterrent feature to maintain approval was necessary does not suggest that these particular claims are non-obvious, especially over prior art such as Bartholomaus, which taught an abuse deterrent formulation. *See Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1331 (Fed. Cir. 2017) (noting "the identified objective indicia must be directed to what was not known in the prior art" and finding "proffered evidence is not probative of the nonobviousness inquiry" where the alleged features driving the commercial success were disclosed in the art); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent."); *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary

consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention.").

Purdue's commercial success expert admitted he did not consider the differences between different abuse deterrent formulations and whether it impacted commercial success. Appx5415-5416 (Sharma 382:16-383:5). Thus, the court properly did not find that the alleged novelty of the Abuse Deterrent Claims drove commercial success. *See Tokai Corp. v. Easton Enterprises, Inc.,* 632 F.3d 1358, 1370 (Fed. Cir. 2011) (affirming finding of no nexus where "Tokai's corporate representative not once referred to the automatic locking feature of Tokai's lighters—i.e., the feature that purportedly distinguishes the claimed inventions from prior art utility lighters.").

Purdue offered no evidence or even argument as to how the allegedly novel features of the invention compared to Bartholomaus and McGinity drove sales. This is especially important here, where Purdue learned of the use of melted PEO to formed a hardened tablet from Grunenthal/Bartholomaus (*e.g.*, Appx5362-5363), and represents that related Bartholomaus patents (covering the work performed by Grunenthal) cover OxyContin. Appx8325; Appx9611; Appx10490; Appx10641; Appx10667.

### b.    The district court's finding of no industry skepticism was not clearly erroneous

Purdue also cannot show that the court clearly erred in evaluating the alleged skepticism. "Doubt or disbelief by skilled artisans **regarding the likely success of a combination or solution** weighs against the notion that one would combine elements in references to achieve the claimed invention." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1335-36 (Fed. Cir. 2016) (emphasis added). Purdue produced no evidence of skepticism that the teachings of Bartholomaus and McGinity could be modified as Accord proposed, and thus it provided no evidence that demonstrates non-obviousness of the "combination or solution."[6]

Instead, Purdue argues that the FDA's concern with approving abuse-deterrent labelling should carry the day. But this is not evidence that the industry or a POSA was skeptical that the claimed invention—which contains no limitations requiring any level of abuse deterrence, let alone FDA approval—could be made.

Purdue's cases are once again inapposite. In *Neptune Generics*, the FDA expressed skepticism that the proposed combination would work. Specifically, this Court noted that "Lilly recommended supplementation with folic acid and vitamin B12" to which the "FDA responded that the 'medical officer does not support adding

---

[6] Below, Purdue argued that the inventor's own skepticism of heating PEO without compression was evidence of non-obviousness. The district court properly rejected that argument because "He does not serve as a stand-in for a POSA or for the industry." Appx24. Purdue does not repeat this argument on appeal.

vitamins to the ongoing ... trial" because "the addition of vitamins ... is risky." *Neptune Generics v. Eli Lilly and Co.*, 921 F.3d 1372, 1378 (Fed. Cir. 2019). On those facts, this Court held that the district court "did not err in finding that skepticism supported a conclusion of nonobviousness." *Id.* That skepticism related directly to the proposed novelty of the claims (adding a vitamin) and the technical feasibility of the proposed combination, and thus it was permissible for the court to give it significant weight.[7]

Here, the skepticism did not relate to the technical feasibility of modifying Bartholomaus's heating mechanisms, but rather to FDA caution that it wanted to see real world results of abuse deterrence prior to approving labelling. That is not evidence of non-obviousness. Indeed, this Court rejected an argument of skepticism nearly identical to Purdue's:

> The court also rejected AstraZeneca's argument that the FDA believed sterilization to be impossible, finding that the FDA had merely placed the onus on AstraZeneca to either achieve sterility or show that it could not be done. We therefore reject AstraZeneca's arguments that the district court erred in analyzing the evidence relating to the objective indicia of nonobviousness.

---

[7] *Allergan, Inc. v. Sandoz Inc.* did not hold that a court erred in finding FDA caution to be ineffective evidence of skepticism. Rather, it simply noted that the "potential for FDA approval also may properly be considered…in determining whether one of ordinary skill would be motivated to develop a drug product and whether there was skepticism regarding the efficacy of such a product." 726 F.3d 1286, 1291-92 (Fed. Cir. 2013).

*AstraZeneca LP v. Breath Ltd.*, 603 F. App'x 999, 1003-04 (Fed. Cir. 2015); *see also In re Magna Elecs., Inc.*, 611 F. App'x 969, 973 (Fed. Cir. 2015) (affirming PTAB finding of no skepticism because the evidence "does not raise doubt that [the claimed invention] can be manufactured"). Thus, the court properly evaluated Purdue's argument of skepticism. Appx24.

Finally, the district court properly decided not to credit Purdue's argument that because OxyContin was the "first extended-release opioid to receive abuse-deterrent labeling" the claims are non-obvious. Appx24. That is especially true because Bartholomaus indisputably discloses an extended-release opioid with abuse-deterrent properties (Appx5709-5710). *See Novartis,* 853 F.3d at 1331 ("The fact that Gilenya was the first to receive FDA approval for commercial marketing does not overcome the fact that solid multiple sclerosis compositions were already known. Thus, we agree with the Board that Novartis' proffered evidence is not probative of the nonobviousness inquiry.").

### c. The district court's finding that there was no evidence of failure to achieve the claimed invention was not clearly erroneous

Purdue also cannot show that the district court clearly erred in evaluating the alleged failure evidence.

With regards to the alleged failure of Accord's previous development partner, Purdue argues that "Accord itself failed to develop a scalable abuse-deterrent

oxycodone formulation because it could not replicate **the proper extended-release dissolution profile** or overcome production obstacles." Br. at 54 (emphasis added); *see also* Appx6001 (noting problem was "fast Dissolution profile").

But the "proper extended-release dissolution profile" is not a limitation of the claims (which recite only an "extended release dosage form") and there is no evidence that Accord failed to make the claimed invention. *Compare In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.,* 676 F.3d 1063, 1082 (Fed. Cir. 2012) ("The patents in suit, of course, cover a therapeutically effective PK profile"). The district court therefore did not clearly err in finding that the alleged failure is irrelevant to obviousness. *C.f. Bos. Sci. Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 991 (Fed. Cir. 2009) (reversing JMOL of non-obvious and finding alleged failure evidence weak where "Cordis presented evidence that the failure was due to difficulty in finding a suitable drug, rather than an inability to conceive of a drug-containing undercoat combined with a drug-free topcoat."); *George M. Martin Co. v. All. Mach. Sys. Int'l LLC,* 618 F.3d 1294 (Fed. Cir. 2010) ("evidence of failures of others is similarly insufficient" where it related to "enhanced throughput over and above the claimed ability to handle a 'plurality of logs'").

Regarding Opana, the district court correctly found the "record is not clear on why Opana was removed from the market." Appx25. Purdue states that it provided

"unrebutted testimony that Opana was withdrawn because it was not sufficiently abuse deterrent." Br. at 56. That is again incorrect.

To the contrary, as the district court recognized, Accord provided expert testimony, supported by documentary evidence, "that Opana ER used a different active ingredient, and that it is unclear why Opana ER was withdrawn." Appx25 citing Appx5705 (Appel 672:7-22). That testimony was supported by the Cicero article stating "although the technology used is cited to be Grunenthal's Intac delivery system by both manufacturers, there may have been some modifications made—which are proprietary in nature and thus not accessible in any detail." Appx6822. Cicero also noted that Opana uses the active ingredient oxymorphone which may "be so rewarding to a select, vulnerable group or subgroup of abusers that obtaining it is worth any effort required to do so." Appx6823. Thus, it warned that "an ADF [Abuse Deterrent Formulation]'s effectiveness may be drug-specific" and "each ADF must be evaluated on its own merits even if the same proprietary technology is used." Appx6819.

Thus, far from "unrebutted"—Purdue's evidence was rebutted with expert testimony and documentary evidence. In contrast, Purdue cites to only testimony from its inventor that "I believe [Opana] was withdrawn for – for things associated with abuse" (Appx5340 (Mannion 307:3-8)); testimony from its expert that

"eventually it was – the FDA requested that it was taken off the market" (Appx5469 (Bley 436:7-9)) and the Cicero article described above (Appx6819). Br. at 56.

The district court was correct to find the record unclear and "Plaintiffs did not establish by a preponderance of the evidence that Opana's removal was 'because the devices lacked the claimed features.'" Appx25 citing *Ormco*, 463 F.3d at 1313 .

> **d.     The district court's finding that a decrease in density was not an unexpected result demonstrating non-obviousness was not clearly erroneous**

Finally, Purdue argues that the district court "misevaluated" unexpected results because it did not credit the testimony of its expert over Accord's. Br. at 57-58. While Accord acknowledged that the slight decrease in density of the claimed formulations heated without compression may have been unexpected, it explained that this did not provide any benefit. Appx5706-5707 (Appel 673:24-9) Purdue simply repeats its expert's testimony and ignores Accord's evidence. That fails to show clear error. *See, e.g.*, *Miles*, 997 F.2d at 874 ("[T]he 'clearly erroneous' standard does not entitle [the appellate] court to reverse the district court's finding simply because it would have decided the case differently.").

Purdue argues that the less dense a tablet is, the more porous it is, and the more porous the tablet is, the quicker solution will enter the tablet and form a gel. This is true. But Purdue then makes two unfounded assumptions that this contributes to abuse-deterrence:

- During the time it takes for the solution to the enter the tablet and form a gel, the oxycodone can be abused and

- This difference in time is meaningful.

But these assumptions lack any support. They are not described in the patent, and Purdue provided no documentary evidence relating porosity or the time it takes solution to enter a crushed tablet to abuse-deterrence. Appx5706-5707 (Appel 673:24-674:9). Indeed, Purdue's only evidence related to porosity is an article describing "bioadhesive, semi-solid systems which were designed for the treatment of periodontal diseases" and entirely unrelated to abuse deterrence. *See* Appx5440 (Bley 407:3-7) describing Appx6023-6028.

Moreover, Purdue's assumptions are logically incorrect. The oxycodone is trapped in the particle matrix ***until*** the solution enters and allows the oxycodone to diffuse out, as shown by Purdue's expert's slides:



Appx17520. But in Purdue's expert's own words the "oxycodone can only be abused when it's in solution, when it's in a liquid." Appx5438 (Bley 405:19-20). Thus, the oxycodone cannot be abused during the time it takes the aqueous solution to penetrate into the particles and release the oxycodone from the matrix. As Dr. Appel explained, when the solution enters the tablet more quickly, "the drug comes out faster" because it is only once the solution enters that the drug can come out. Appx5706-5708 (Appel 673:20-675:21). In fact, this is what is shown in Purdue's evidence. Appx6023 (noting "increased tetracycline release rates, due to an increased formulation porosity").

Nor did Purdue even attempt to describe the magnitude of the alleged time difference for gelling between compression heated tablets and tablets heated without compression (e.g., whether it would be in milliseconds, seconds, etc.). However, Dr. Bley admitted that gelling occurs "very, very quickly" (Appx5478-5479) and Dr. Appel explained the difference in density is quite small, and would have no meaningful or significant effect on how quickly the solution enters and the gel forms. Appx5708-5709 (Appel 675:22-676:1). Even if there were some benefit to faster gelling, the difference would be negligible. Thus, the district court did not clearly err in finding that "at most" the evidence was in "equipoise." Appx21-22.

Finally, even assuming *arguendo* that the decrease in density would make the formulation "potentially, more resistant to abuse" as Purdue's inventor put it

(Appx5369 (Mannion 326:2-11)), the court did not err in finding that this "would not alone undermine the clear and convincing evidence that the invention's claimed properties are obvious." Appx22; *see Allergan*, 726 F.3d at 1293 (reversing finding of non-obviousness because "whether or not that combination" provided an additional benefit "we find the motivation to make the combination was real.").

For these reasons, the Court should affirm the district court's judgment of invalidity of the Abuse Deterrent Claims.

## II.    The district court correctly found the Low-ABUK claims obvious

Purdue argues that it "identified *both* an unknown problem *and* the source of that problem while developing low-ABUK oxycodone" which "preclude[s] a finding of obviousness." Br. at 59-60. Purdue is wrong on both the facts and the law.

### A.    The district court properly applied the flexible test for obviousness outlined in *KSR*

Purdue argues that where a problem or source of a problem is not expressly in the prior art, then the solution to that problem must as a matter of law be non-obvious *regardless* of whether a POSA would have discovered the source or been able to solve the problem anyway. Br. at 59-60. Purdue is incorrect.

First, there is a difference between an unknown *problem* and an unknown *source*. Where a problem is entirely unknown, there may be no motivation to solve it. *See Leo Pharm. Prod., Ltd. v. Rea*, 726 F.3d 1346, 1353-54 (Fed. Cir. 2013); *Novartis Pharms Corp. v. Watson Labs., Inc.*, 611 F. App'x 988, 996 (Fed. Cir.

47

2015) ("Although the addition of an antioxidant would have been an obvious solution for a formulation with known oxidation problems, here Watson failed to prove that a rivastigmine formulation was known to be susceptible to oxidative degradation."). In contrast, when a problem is known, there is motivation to solve that problem which may include determining its source.

While *Eibel* does at least relate to an unknown source of a problem, it was not merely that the source was unknown that per se led to a conclusion of non-obviousness. It was that in addition to the unknown source, the field had engaged in decades of attempts to solve the problem without success and quickly adopted Eibel's method. *See Eibel Process Co. v. Minnesota & Ontario Paper Co.,* 261 U.S. 45, 68 (1923) ("The fact that in a decade of an eager quest for higher speeds this important chain of circumstances had escaped observation, the fact that no one had applied a remedy for the consequent trouble until Eibel, and the final fact that, when he made known his discovery, all adopted his remedy, leave no doubt in our minds that what he saw and did was not obvious, and involve discovery and invention."). In other words, while there may have been a motivation to solve the problem, it went unsolved for a decade, demonstrating no reasonable expectation of success in solving it.

Purdue argues that its claims cannot be obvious because "when a patentee has discovered either a previously unknown problem, or the previously known source of

a problem, obviousness does not turn on an inquiry as to whether the discovery was characterized as routine." Br. at 62. It cites *Novartis* for this proposition, stating that the Court there "did not evaluate whether the discovery of the oxidation problem was routine or not—it was sufficient that the problem was previously unknown." Br. at 63 (citing 611 F. App'x at 995-96). First, *Novartis* relates to ***the problem*** being unknown, not the source. Second, that the *Novartis* Court did not address whether it was routine to identify the problem is because the challenger never argued that a POSA would have discovered the oxidation problem, instead arguing that the prior art "illuminates the problem and proposes the solution." 611 F. App'x at 995.

Both *Leo* and *Eibel* addressed whether the problem or source of the problem, while not explicitly known, would have readily been determined, and found that it would not have been as evidenced by real world failure to reach a solution for nearly a decade. *See Leo*, 726 F.3d at 1354 ("If these discoveries and advances were routine and relatively easy, the record would undoubtedly have shown that some ordinary artisan would have achieved this invention within months of Dikstein or Serup. Instead this invention does not appear for more than a decade."); *Eibel*, 261 U.S. at 68 (relying on the "fact that in a decade of an eager quest for higher speeds this important chain of circumstances [i.e., the source of the problem] had escaped observation").

Indeed, this Court's predecessor recognized that whether the source of a problem was known was not the end of the inquiry, but the beginning. *Application of Ryan*, 480 F.2d 1388, 1392 (C.C.P.A. 1973) ("we fail to see how the discovery of the specific source of the problem, holding of regenerant in the surge tank, tends to render the adoption of that expedient nonobvious"); *Application of Peehs*, 612 F.2d 1287, 1290 (C.C.P.A. 1980) ("Where an applicant contends that the discovery of the source of a problem would have been unobvious to one of ordinary skill in the pertinent art at the time the claimed invention was made, it is incumbent upon the PTO to explain its reasons if it disagrees.").

Purdue's test would create an iron clad rule of non-obviousness in direct violation of the Supreme Court's maxim in *KSR* that the obviousness inquiry be "expansive and flexible." 550 U.S. at 415. "Rigid preventative rules that deny factfinders recourse to common sense…are neither necessary under our case law nor consistent with it." *Id.* at 421. Rather, a court must consider holistically whether a claim would have been obvious, in light of the complete record, including whether a POSA (once motivated) would have identified the source of a new problem. As discussed below, the court's finding that a POSA would have discovered 8α's role as the source of the 14-hydroxy problem and solved it properly supports a conclusion of obviousness.

50

Moreover, Purdue's test suggests that an invention cannot be obvious even if a POSA would have arrived at it irrespective of knowledge of the source of the problem. That again is not the law. "*Eibel Process* and [others] stand for the proposition that the discovery of an unknown problem can result in a patentable invention, even if the solution would have been obvious once the problem is identified…They did not address whether the Board must consider the discovery of an unknown problem when there exists an independent motivation to combine prior art references." *In re Conrad*, 759 F. App'x 982, 985 (Fed. Cir. 2019). Indeed, this Court has already rejected Purdue's argument in the context of the Low-ABUK claims, finding previous claims to low-14-hydroxy oxycodone composition obvious because "the source of 14–hydroxy in the end product…did not need to be solved to arrive at the claimed invention." *Purdue*, 811 F.3d at 1352. Thus, as discussed more fully below, the district court's finding that a POSA would have solved the 14-hydroxy problem even without discovering 8α's role as the source independently supports a conclusion of obviousness.

**B.    The district court's factual findings were not clearly erroneous and its conclusion of obviousness was correct**

In this case the problem was known—as the evidence indisputably showed, the FDA expressed concerns about ABUKs like 14-hydroxy to opioid manufacturers (including Purdue) in 2002, before the earliest alleged invention date. Appx8485-8486. As the court found, that provided a strong motivation for the industry to

51

produce low 14-hydroxy oxycodone compositions. Appx39. Thus, far from unknown, the **problem** was explicitly identified by the FDA and Purdue's reliance on cases such as *Leo* and *Novartis* are inapposite.[8]

Purdue incorrectly conflates being unknown with being unexpected. As Accord's expert Dr. Martin explained, once motivated by the FDA's guidance requiring lower 14-hydroxy concentration, a POSA would have discovered 14-hydroxy was reforming during salt formation. Appx5105-5107 (Martin 73:16-75:4). And Dr. Martin explained a POSA would have proposed two reaction mechanisms that explain the presence of the known products of the oxidation of thebaine, 8β and 14-hydroxy, to identify other possible byproducts that could be the source of residual 14-hydroxy. Appx5079-5080 (Martin 47:14-48:5), Appx5111-5112 (Martin 79:17-80:15). Purdue's expert agreed. Appx5635-5636 (Wuest 602:16-603:2).

Dr. Martin then explained why those reaction mechanism would have suggested 8α's presence. Appx5080-5086 (Martin 48:6-54:16). Again, Purdue's expert agreed, and did not offer any contrary mechanisms. Appx5636-5638 (Wuest

---

[8] Purdue misleadingly suggests that Accord's expert "admitted that 'there *wasn't* a knowledge of the problem.'" Br. at 61(citing Appx517 (Martin 139:20-25)). Dr. Martin was explaining that the prior art references at issue pre-dated the FDA's request to lower 14-hydroxy to under 10 ppm and thus "at the time they were doing their chemistry" they were not attempting to lower 14-hydroxy to under 10 ppm. Appx517 (Martin 139:20-25).

603:3-605:15), Appx5641-5642 (Wuest 608:23-609:10).[9] And as Dr. Martin explained, it would have taken only routine methods to confirm the presence of 8α. Appx5112-5113 (Martin 80:2-81:9). Thus, far from 8α being "undisputedly" unexpected as Purdue argues (Br. at 62), the court correctly found that a POSA would have readily identified 8α as an unsurprising source of residual 14-hydroxy based on the testimony of ***both*** experts. Appx41.

Dr. Martin then explained how with this knowledge, the solution would have been simple for a POSA—convert 8α by dehydration into 14-hydroxy prior to or concurrent with hydrogenation so that any 14-hydroxy generated is converted into oxycodone. Appx5119-5121 (Martin 87:16-89:12); Appx41-42. Again, Purdue does not challenge that factual finding.

Moreover, the district court found that same solution would have been apparent even ***without*** the discovery of the role of 8α. Appx45. Purdue misrepresents the district court's opinion. It did not "reason that a POSA would not necessarily have needed to identify 8α to achieve low-ABUK levels" ***because*** "it was inherently in the composition" as Purdue implies. Br. at 62. Rather, the court found that 8α was

---

[9] Moreover, the prior art had proposed the same mechanism for similar oxidation reactions in the art, leading to the formation of similar molecules with 8α stereochemistry. *See* Appx5086-5087 (Martin 54:17-55:10), Appx5141-5143 (Martin 109:4-111:20); Appx5638-5641 (Wuest 605:16-608:22); Appx6871-6873; Appx6860-6870.

present in prior art compositions (and thus merely reciting its presence did not render the claims patentable, Appx44) ***and separately*** that a POSA would not have needed to be aware of 8α to solve the problem (Appx45).

That is because 8β was known to be present during the manufacture of oxycodone, and was known to convert to 14-hydroxy under acidic conditions. Appx5107 (Martin 75:5-25), Appx5132-5133 (Martin 100:17-101:3); Appx9497-9489; Appx9499-94502. As Dr. Martin explained, a POSA would have removed 8β by dehydration prior to or concurrent with hydrogenation so that any 14-hydroxy generated by dehydration of 8β was converted into oxycodone. Appx5108-5109 (Martin 76:1-77:24). In doing so, a POSA would have inherently and necessarily removed any 8α, because 8α undergoes dehydration more readily than 8β. Appx5119-5120 (Martin 87:16-88:1), Appx5132-5133 (Martin 100:17-24). In other words, a POSA would have arrived at the same solution even without the knowledge of 8α. Appx46 ("I conclude that a POSA would seek to dehydrate 8α and 8β based on the credible testimony of Dr. Martin."). Again, Purdue does not challenge this factual finding.

Moreover, Purdue did not provide persuasive objective indicia demonstrating non-obviousness of the claims. While Purdue argued that the mere fact that another manufacturer (Noramco) told the FDA achieving low 14-hydroxy oxycodone would be a "challenge," the court rationally recognized that under-promising the FDA was

a prudent business decision. Appx42. Purdue cannot show that the determination was clearly erroneous. *See Merck*, 874 F.3d at 728 ("A factual finding is only clearly erroneous if…we are left with the definite and firm conviction that a mistake has been made.").

Moreover, in this same letter to the FDA Noramco had identified 8,14-dihydroxy (without specifying 8α or 8β) as the source of residual 14-hydroxy and informed the FDA of this understanding prior to the invention date. Appx10995; Appx5659-5661 (Wuest 626:10-628:16). Thus, the real world evidence confirms Accord's argument that a POSA would have understood that one or both 8,14 dihydroxy molecules were the source of residual 14-hydroxy.[10]

Finally, while the district court did not rely on it in reaching its decision, there was contemporaneous invention of low 14-hydroxy oxycodone compositions by similar methods by the Casner group, which filed its earliest patent application disclosing the solution a mere five months after Purdue filed its earliest provisional

---

[10] Normaco's subsequent success in meeting the FDA's requirement to achieve sub 10 ppm 14-hydroxy oxycodone by an agreed upon date of 2007 does not demonstrate non-obviousness. Indeed, this fact was explicitly found in previous litigations involving Purdue. *See In re OxyContin*, 994 F. Supp. 2d at 400 ("Purdue has not come forward with any evidence to link Noramco's low-ABUK development schedule to the difficulty of manufacturing a low-ABUK product. Rather, Noramco and the FDA agreed to a timetable for producing low-ABUK oxycodone API.… Noramco's development adhered to that timetable… Noramco's slower production schedule is not evidence of failures along the way, and it does not necessarily indicate any particular difficulty of reducing 14–hydroxy in oxycodone API.").

application. *Compare* Appx9521 *with* Appx436. This confirms that it was within the skill of a POSA to solve the problem and hence the obviousness of the claims. *See George M. Martin Co.*, 618 F.3d at 1305 ("Independently made, simultaneous inventions, made within a comparatively short space of time, are persuasive evidence that the claimed apparatus was the product only of ordinary mechanical or engineering skill."); *Ecolochem, Inc. v. S. California Edison Co.*, 227 F.3d 1361, 1379 (Fed. Cir. 2000) ("The fact of near-simultaneous invention, though not determinative of statutory obviousness, is strong evidence of what constitutes the level of ordinary skill in the art.") (citation omitted).

Based on the unchallenged factual findings, the district court correctly found that the Low-ABUK claims were invalid for obviousness.

## CONCLUSION

For these reasons, this Court should affirm.

Respectfully submitted,

/s/ *Alejandro Menchaca*
Alejandro Menchaca
Ben J. Mahon
Bradley P. Loren
MCANDREWS, HELD & MALLOY, LTD.
500 W. Madison Street, 34th Floor
Chicago, IL 60661
(312) 775-8000
*Counsel for Appellee Accord Healthcare, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** <u>2023-1953</u>

**Short Case Caption:** <u>Purdue Pharma L.P. v. Accord Healthcare, Inc.</u>

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑    the filing has been prepared using a proportionally-spaced typeface and includes <u>12,730</u> words.

☐    the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐    the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>09/11/2023</u>

Signature: <u>/s/ Ben J. Mahon</u>

Name: <u>Ben J. Mahon</u>