No. 23-1953

# United States Court of Appeals for the Federal Circuit

PURDUE PHARMA L.P., PURDUE PHARMACEUTICALS L.P., RHODES TECHNOLOGIES,

*Plaintiffs-Appellants*,

v.

ACCORD HEALTHCARE, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court for the District of Delaware
No. 1:20-cv-01362-RGA, Judge Richard G. Andrews

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

Daniel G. Brown
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Gregory A. Castanias
Jennifer L. Swize
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3639

Gregory G. Garre
Margaret A. Upshaw
Alexander G. Siemers
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

David F. Kowalski
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

*Counsel for Plaintiffs-Appellants Purdue Pharma L.P., Purdue Pharmaceuticals L.P., Rhodes Technologies*

November 1, 2023

(*additional counsel on inside cover*)

John J. Normile
Gasper J. LaRosa
JONES DAY
250 Vesey Street
New York, NY 10281-1047
(212) 326-3939

Pablo D. Hendler
POTOMAC LAW GROUP, PLLC
1177 Avenue of the Americas
5th Floor
New York, NY 10036
(914) 893-6883

# CERTIFICATE OF INTEREST

**Case Number**: 23-1953

**Short Case Caption**: *Purdue Pharma L.P. v. Accord Healthcare, Inc.*

**Filing Party/Entity**: Purdue Pharma L.P., Purdue Pharmaceuticals L.P., Rhodes Technologies, Plaintiffs-Appellants

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: November 1, 2023 Signature: */s/ Gregory G. Garre*
Name: Gregory G. Garre

1. **Represented Entities**. Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   Purdue Pharma L.P., Purdue Pharmaceuticals L.P., Rhodes Technologies

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. Fed. Cir. R. 47.4(a)(3).

   None.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   **Jones Day:** Sarah A. Geers, Kevin V. McCarthy, Adam M. Nicolais (no longer with firm), Kelsey I. Nix (no longer with firm).

**Morris, Nichols, Arsht & Tunnell LLP:** Jack B. Blumenfeld, Megan Elizabeth Dellinger, Rodger Dallery Smith, II.

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Yes.

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None/Not Applicable.

## TABLE OF CONTENTS


Page

CERTIFICATE OF INTEREST ....... i

TABLE OF AUTHORITIES ....... iv

INTRODUCTION ....... 1

ARGUMENT ....... 3

I. THE DISTRICT COURT ERRED IN HOLDING THE ABUSE-DETERRENT PATENTS OBVIOUS ....... 3

A. Accord's Attempt To Deflect Attention From The Legal Errors Infecting The District Court's Obviousness Determination Fails ....... 3

B. The District Court Erred In Finding A Motivation To Combine And Reasonable Expectation Of Success ....... 5

1. The District Court Erred In Concluding That Heating Without Compression Would Have Been Obvious ....... 5

2. The District Court's Reliance On "Routine Experimentation" For The Time And Temperature Limitations Was Also Legal Error ....... 18

C. The District Court Erred In Dismissing The Compelling Objective Indicia Of Non-Obviousness ....... 20

1. The District Court Misevaluated Commercial Success ....... 20

2. The District Court Misevaluated Failure Of Others ....... 22

3. The District Court Misevaluated Skepticism ....... 23

4. The District Court Misevaluated Unexpected Results ....... 24

II. THE DISTRICT COURT ERRED IN HOLDING THE LOW-ABUK PATENTS OBVIOUS ....... 24

CONCLUSION ....... 31

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Allergan, Inc. v. Sandoz Inc.*,
726 F.3d 1286 (Fed. Cir. 2013) ....................24

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) ....................19

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
381 F.3d 1371 (Fed. Cir. 2004) ....................25

*ClassCo., Inc. v. Apple, Inc.*,
838 F.3d 1214 (Fed. Cir. 2016) ....................21

*In re Copaxone Consolidated Cases*,
906 F.3d 1013 (Fed. Cir. 2018) ....................14

*Eibel Process Co. v. Minnesota & Ontario Paper Co.*,
261 U.S. 45 (1923)....................26, 27

*Endo Pharmaceuticals Inc. v. Actavis LLC*,
922 F.3d 1365 (Fed. Cir. 2019) ....................12

*Golan v. Pingel Enterprise, Inc.*,
310 F.3d 1360 (Fed. Cir. 2002) ....................6

*Google LLC v. Koninklijke Philips N.V.*,
795 F. App’x 840 (Fed. Cir. 2020) ....................9

*Honeywell International Inc. v. Mexichem Amanco Holding S.A. de C.V.*,
865 F.3d 1348 (Fed. Cir. 2017) ....................5, 27

*Kimberly-Clark Corp. v. Johnson & Johnson*,
745 F.2d 1437 (Fed. Cir. 1984) ....................6

*KSR International Co. v. Teleflex, Inc.*,
550 U.S. 398 (2007)....................8

*Leo Pharmaceutical Products, Ltd. v. Rea*,
726 F.3d 1346 (Fed. Cir. 2013) ....................12, 29

**Page(s)**

*In re Linnert*,
309 F.2d 498 (C.C.P.A. 1962) .......................................................... 29

*Merck & Co. v. Teva Pharmaceuticals USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) .......................................................... 21

*In re Nomiya*,
509 F.2d 566 (C.C.P.A. 1975) .......................................................... 25

*Novartis Pharmaceuticals Corp. v. West-Ward Pharmaceuticals International Ltd.*,
923 F.3d 1051 (Fed. Cir. 2019) .......................................................... 9

*Novartis Pharmaceuticals Corp. v. Watson Laboratories, Inc.*,
611 F. App'x 988 (Fed. Cir. 2015) .......................................................... 29

*Ortho-McNeil Pharmaceutical, Inc. v. Mylan Laboratories, Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) .......................................................... 9, 11

*In re OxyContin Antitrust Litigation*,
994 F. Supp. 2d 367 (S.D.N.Y. 2014), *aff'd sub nom.*
*Purdue Pharma L.P. v. Epic Pharma, LLC*,
811 F.3d 1345 (Fed. Cir. 2016) .......................................................... 29

*PAR Pharmaceutical, Inc. v. TWI Pharmaceuticals, Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) .......................................................... 9

*In re Peehs*,
612 F.2d 1287 (C.C.P.A. 1980) .......................................................... 26

*PPC Broadband, Inc. v. Corning Optical Communications RF*,
815 F.3d 734 (Fed. Cir. 2016) .......................................................... 21

*Purdue Pharma L.P. v. Collegium Pharmaceutical, Inc.*,
335 F. Supp. 3d 149 (D. Mass. 2018) .......................................................... 30

*Purdue Pharma L.P. v. Epic Pharma, LLC*,
811 F.3d 1345 (Fed. Cir. 2016) .......................................................... 29, 30

*Sanofi-Synthelabo v. Apotex, Inc.*,
550 F.3d 1075 (Fed. Cir. 2008) .......................................................... 14

**Page(s)**

*In re Sponnoble*,
405 F.2d 578 (C.C.P.A. 1969) ....................................................................26

*Volvo Penta of the Americas, LLC v. Brunswick Corp.*,
81 F.4th 1202 (Fed. Cir. 2023) ....................................................................20

*In re Watts*,
354 F.3d 1362 (Fed. Cir. 2004) ....................................................................17

## STATUTES

35 U.S.C. § 103 ....................................................................................14

## INTRODUCTION

Accord's brief confirms the fundamental flaws in the district court's decision. Unable to refute the court's numerous legal errors, Accord tries to recast those errors as factual determinations entitled to deference. Nearly forty times, Accord invokes the clear-error standard. But incessantly calling legal errors factual determinations does not make them such (and Accord would lose under the clearly erroneous standard, anyway). So Accord tries another tack. It advances a series of alternative theories that the district court itself never adopted. But this gambit fails too—Accord's alternative theories cannot withstand scrutiny. Ultimately, Accord has no answer for the legal errors infecting the district court's obviousness determinations. And those determinations cannot stand. Both the abuse-deterrent patents and the low-ABUK patents claim innovative solutions to serious problems previously associated with extended-release oxycodone, which others had failed to overcome and, in the case of the low-ABUK patents, even discover.

**Abuse-Deterrent Patents**: The fundamental problem with the district court's obviousness analysis of the abuse-deterrent patents is that it failed to consider all the truly innovative and interdependent steps a POSA would have had to take to arrive at the claimed invention, viewing the claim as a whole. Those steps are summarized by bullet points on pages 46-47 of Purdue's principal brief—which Accord tellingly ignores. Instead, the district court analyzed those steps in isolation, first breaking

them apart and then trying to pick them off one by one in a classic hindsight analysis. And that analysis was itself infected by legal errors. For example, the district court erroneously (i) resorted to inferential leaps to overcome the absence of evidence; (ii) invoked the "obvious to try" principle to paper over gaps in the prior art, without finding the finite, predictable solutions in the prior art needed to apply that standard; and (iii) relied on "routine experimentation" where the conditions of the claim were absent from the prior art. Purdue Br. 32-45. Compounding these legal errors, the district court then treated the compelling objective indicia of obviousness as an afterthought and dismissed them based on a series of additional legal errors.

**Low-ABUK Patents**: The district court likewise erred in holding the low-ABUK patents obvious. Indeed, the court erroneously discounted *both* of Purdue's discoveries leading to these patents—of an unknown problem (reappearing 14-hydroxy) *and* of that problem's source (the impurity 8α). Those discoveries are antithetical to any legal conclusion of obviousness. Nevertheless, Accord doubles down on the district court's flawed analysis and contends those novel and unexpected discoveries do not matter. That is wrong under both this Court's and the Supreme Court's case law. Purdue's discoveries were integral to the development of the low-ABUK patents, which specifically recite 8α, and these discoveries belie the notion that these patents were somehow obvious.

The district court's decision should be reversed.

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN HOLDING THE ABUSE-DETERRENT PATENTS OBVIOUS

#### A. Accord's Attempt To Deflect Attention From The Legal Errors Infecting The District Court's Obviousness Determination Fails

Instead of attempting to answer the legal errors infecting the district court's decision, Accord repeatedly dismisses the court's reasoning and substitutes alternate rationales and evidentiary arguments the court did not even mention.

For example, Accord dismisses the district court's statement that it "is not much of a leap to infer that ovens would also be useful," Appx13, as "merely a shorthand summary" of the evidence, Accord Br. 18. It contends that a generic statement in the prior art that the court said was "sufficient" to support its finding, Appx16-17, was actually "not the basis" of its finding, Accord Br. 27. And it posits that the court's use of "monopoly" simply referred to "Purdue's dominant position in the market." *Id.* at 35 n.5. But such revisionist attempts to recast the district court's decision only confirm the problems with the court's *actual* analysis.

Meantime, Accord just ignores many of the serious legal errors Purdue identified in the court's decision. For example, Accord does not address the court's legally erroneous decision to assume "the claimed times and temperatures" when examining a reasonable expectation of success. Appx15 n.5. It does not defend the court's flawed conclusion that FDA's skepticism does not apply to obviousness

because the agency is "not in the [pharmaceutical] industry." *Compare* Purdue Br. 53-54, *with* Accord Br. 39-40. And it has no response, again, when it comes to the court's contradictory conclusion that the failures of others in production and scaling were somehow irrelevant because they reinforced a scalability motivation to combine. *Compare* Purdue Br. 55, *with* Accord Br. 41-42.

Instead, Accord tries to divert this Court's attention. Accord invokes the clear-error standard of review nearly forty times, attempting to cast this appeal as a fight over factual findings. That could not be further from the truth. The district court's obviousness determination rests on a series of *legal* errors. Those errors require reversal of the court's obviousness determination, which ultimately is a *legal* conclusion itself. Purdue Br. 28. And, as explained in Purdue's principal brief, these errors necessarily tainted the court's factual findings with respect to motivation to combine, reasonable expectation of success, and objective indicia. Again, Accord's attempt to deflect attention from the legal errors tainting the district court's decision underscores that it has no *answer* for those errors.

Viewed under the proper legal framework, Accord failed, as a matter of law, to prove that the claims would have been obvious by clear and convincing evidence. The conclusory testimony of Accord's expert and other evidence fell far short. *See* Purdue Br. 28-29, 34-35, 40; *infra* at 14-18. Indeed, instead of evidence, the district court resorted to inferential "leaps" to justify its decision. *Infra* at 5-8. But the

abuse-deterrent patents reflect a novel invention, developed after a massive investment of time and resources and the tireless work of highly talented scientists, after numerous others—including Accord—had failed. Purdue Br. 7-15. The district court's decision should be reversed. At a minimum, a remand is necessary for the district court to consider the parties' evidence under the proper legal framework, free from the legal errors Purdue has identified. *See, e.g.*, *Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. de C.V.*, 865 F.3d 1348, 1354 (Fed. Cir. 2017).

### B. The District Court Erred In Finding A Motivation To Combine And Reasonable Expectation Of Success

As Purdue explained, the district court's analysis of (1) motivation to combine and (2) reasonable expectation of success are each infected by independent legal errors. Purdue Br. 30-47. At a minimum, the district court's determinations were clear error. Accord has no answer for those errors.

#### 1. The District Court Erred In Concluding That Heating Without Compression Would Have Been Obvious

*Motivation to Combine.* The district court determined that a POSA would have been motivated to modify Bartholomaus and McGinity using the oven art to develop a scalable process for creating hardened PEO tablets. Appx12-13. That finding was infected by numerous errors. *See* Purdue Br. 34-41.

1. The district court impermissibly rested its motivation to combine finding on its view that it "is *not much of a leap to infer* that ovens would also be useful for applying heat to harden" PEO tablets. Appx13 (emphasis added); Purdue Br. 34-35. But such an inferential leap is insufficient to satisfy the clear and convincing evidence standard. *See Golan v. Pingel Enter.*, 310 F.3d 1360, 1372 (Fed. Cir. 2002) (reasonable jury could not find "clear and convincing evidentiary burden" satisfied where "only evidence" was based on "an inference"). Moreover, the court's inference also improperly focused only on unclaimed subject matter—the usefulness of an oven as a "heating tool[]," Appx13—and "lost sight of" the "essential [elements] of the claimed invention," *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1448 (Fed. Cir. 1984). Those elements include the novel process of compressing PEO tablets and then curing "without compression" above the melting temperature. Appx16.

In attempting to defend the district court's inference, Accord focuses on the court's analysis of the general motivation to modify Bartholomaus and McGinity to produce a commercially scalable process. *Compare* Appx11-13, *with* Accord Br. 18-19. But that is just a preliminary step. The critical issue is whether there was motivation to combine Bartholomaus and McGinity *with the oven art*. Appx13-14.

The district court devoted only two paragraphs to that issue. The first paragraph simply states that ovens were commonly available. Appx13. That shows

nothing as to motivation to combine. The second paragraph attempts to excuse the fact that ovens "had only been used to heat polymers other than PEO." Appx13. Yet the court identified *no* record evidence that affirmatively demonstrated that a POSA would combine the oven art with McGinity and Bartholomaus. In fact, the *only* testimony the court cited in these two paragraphs instead confirmed that overheating PEO could cause "drug degradation," "polymer degradation," and "loss of … tablet structure." Appx5265 (Appel 233:6-13) (cited at Appx13-14). That testimony underscores that it would *not* have been obvious to a POSA to use the oven art—which lacked the simultaneous compression McGinity and Bartholomaus used to *avoid* loss of tablet structure—in the way Accord suggests. After all, why would Bartholomaus and McGinity have used non-scalable processes requiring simultaneous compression if it were obvious that ovens, which were commercially preferable, would have worked instead?

The district court's discussion fails to address why a POSA would turn to references dealing with *different* drug substances and *different* matrix polymers for a *different* purpose—none of which disclosed heating a polymer above its melting point. Purdue Br. 31, 35; *see also* Appx5318 (Appel 285:12-16); Appx5264-5267, Appx5287 (Appel 232:17-235:2, 255:2-9) (Accord's expert acknowledging substantial differences between oven art and asserted patents); Appx7-8 (oven art disclosed tablets made with three specific polymers: Kollidon-SR, EUDRAGIT, and

PLA). Those differences were important. For example, the oven art dealt with *amorphous* polymers, whereas PEO is "at least semi-crystalline." Appx5320 (Appel 287:19-22); *see* Appx5447-5449 (Bley 414:24-416:10). Amorphous polymers generally do not melt, instead transitioning "from a glass to a rubber" with heat. Appx5319-5320 (Appel 286:16-287:2); Appx5448-5449 (Bley 415:16-416:10). By contrast, crystalline polymers like PEO can melt and thereby turn into a puddle. Appx5265 (Appel 233:6-13). Accord failed to show by clear and convincing evidence that a POSA would look to the oven art notwithstanding the particular concerns a POSA would have about heating PEO above its melting point without compression.

By ignoring those obstacles in favor of its own inferences, the district court improperly relieved Accord of its evidentiary burden. Purdue Br. 34-35.

2. The district court's invocation of *KSR*'s "obvious to try" standard to overcome these difficulties was legal error. Appx13 (citing *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 421 (2007)). The "obvious to try" standard applies only where there are finite, predictable solutions in the first place. Purdue Br. 36-41. But the district court never found that there were finite, predictable solutions to the "known problem" of "abuse by crushing," or even to the narrower problem of modifying Bartholomaus and McGinity to make abuse-deterrent tablets at commercial scale.

Appx9. Nor could it have—there were innumerable paths a POSA could take in attempting to address these problems. *See* Purdue Br. 36-41.

Accord contends that whether a POSA would have even started with physical abuse deterrence—as opposed to, *e.g.*, an antagonist, as taught in the prior art—is "irrelevant" to determining whether the "obvious to try" standard can properly apply. Accord Br. 21-23; *see* Purdue Br. 36-38. But this Court has made clear that it is inappropriate to invoke the "obvious to try" standard where, as here, "the record shows that a person of ordinary skill *would not even be likely to start*" where the inventor did. *Ortho-McNeil Pharm., Inc. v. Mylan Laboratories, Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) (emphasis added). That rule controls here.

Accord's cases (at 22-23) do not hold otherwise. Neither *Novartis* nor *PAR* mentions *KSR*'s "obvious to try" standard, much less supports invoking the standard in the circumstances here. *See Novartis Pharms. Corp. v. West-Ward Pharms. Int'l Ltd.*, 923 F.3d 1051, 1060-62 (Fed. Cir. 2019) (finding patents non-obvious); *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1200 (Fed. Cir. 2014) (vacating obviousness determination due to improper inherency analysis). And the unpublished decision Accord cites suggests only that it may "sometimes" be appropriate to focus on "what is undisputedly the sole point of novelty in the claim at issue." *Google LLC v. Koninklijke Philips N.V.*, 795 F. App'x 840, 844 (Fed. Cir. 2020). Here, there is no undisputed, single point of novelty—the entire process is

novel; there were innumerable options for designing that process; and the record indicates a POSA would not even have started with that uncertain path in the first place. Purdue Br. 37-38. The "obvious to try" standard does not apply in these circumstances.

In any event, even under the artificially narrow framing Accord urges, the art did not disclose finite, predictable options, and the district court made no such finding. Within physical abuse deterrence, Accord's own expert laid out three broad categories to consider in hardening a tablet: materials, architecture, and process. Appx5244 (Appel 212:8-22). Each of those categories contains a multitude of options—as to materials, for example, Bartholomaus alone discloses over 100 active ingredients, dozens of potential auxiliary substances, and nine different polymers. Purdue Br. 43. Accord is thus wrong to suggest (at 24 n.4) that "Bartholomaus already provides all of th[e] answers" when it comes to "the ingredients to use and in what amounts." This is a classic hindsight analysis that glosses over the novel choices a POSA would have had to make to arrive at the claimed inventions.

For example, even with Bartholomaus and McGinity in hand, to arrive at the claimed inventions a POSA would have had to:

- pick PEO as the polymer from a number of different options;
- choose to heat PEO in an oven without compression, even though it had never been done before;

- opt to heat PEO above its melting point despite concerns about degrading the active ingredient, altering its release profile, and deforming the tablets; *and*
- decide on the appropriate heating times without any evidence of target parameters (*e.g.*, gelling, hardness, stability) or minimum and maximum ranges.

Purdue Br. 36-41, 46-47. Accord's claim that this was all obvious is entirely implausible and rests solely on the forbidden use of hindsight.

Accord admitted that this process required a POSA to "balance opposing considerations in arriving at the claimed invention, ensuring that the PEO would harden, the active ingredient would not degrade, and the method would be practical." Appx15. That is the least of it. But Accord's expert overtly ignored the many different possible routes a POSA could pursue. Instead, she testified only that "one way" to "modify the process" was by "melting the matrix polymer." Appx5244-5245 (212:23-213:1). That testimony cannot support the obviousness determination—it "simply retraced the path of the inventor with hindsight, discounted the number and complexity of the alternatives, and concluded that the invention … was obvious." *Ortho-McNeil*, 520 F.3d at 1364.

In its brief, Accord again disclaims the range of complex choices a POSA would face, instead insisting the sole question is whether there were a finite number of tools for "heating the PEO." Accord Br. 23. But that simply fails to consider the

claims as a whole. What is novel in the patents is the entire "manufacturing process." Appx21. In failing to consider the interrelated claim limitations together, Accord improperly oversimplifies the difficult task a POSA faced at the time of the invention, just as the district court did.

Given the "breadth of [possible] choices and numerous combinations" here, it was "impermissible" to employ the narrow "obvious to try" standard. *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1356 (Fed. Cir. 2013). The district court's erroneous invocation of that standard alone requires reversal.

*Reasonable Expectation of Success*. The district court's analysis as to reasonable expectation of success was similarly flawed. Purdue Br. 41-44. As an initial matter, the court erred as a matter of law by improperly lowering Accord's burden by asking only whether a POSA "might" or "could" reasonably expect success. *Id.* at 41. Accord tries to paper over that important legal error, faulting Purdue for relying on "semantics" because the district court "laid out the correct standard." Accord Br. 25. But bare recital of a legal standard does not excuse errors in applying it—as Accord's own case law acknowledges. *See Endo Pharms. Inc. v. Actavis LLC*, 922 F.3d 1365, 1378 (Fed. Cir. 2019) (court "articulated the proper legal standard and *applied* the correct standard" (citation omitted)). At the critical juncture, the district court looked only to what a POSA *might* or *could* expect, not what a POSA *would* expect, as required. Appx16-18.

The district court compounded that error by impermissibly narrowing the inquiry in multiple ways. First, the court refused to consider testimony about "challenges associated with PEO tablets, including achieving the same extended release profile," in analyzing reasonable expectation of success. Appx16 n.6. Though Accord asserts that the extended-release profile is not a claim limitation (Accord Br. 42), one of the asserted claims expressly recites an "extended release dosage form," *see* Appx302 (cls. 1, 11), and a commercially scalable process only works if the tablets possess the desired extended-release profile. After all, Accord itself failed after extensive efforts to develop a commercially suitable, abuse-deterrent product precisely because of this hurdle. *See* Accord Br. 41-42; *infra* at 22-23.

Second, the district court asked "only" whether a POSA "could reasonably expect" to succeed in making hardened tablets by moving from simultaneous to sequential compression and heating—while *assuming* "the claimed times and temperatures." Appx15 n.5; *see* Purdue Br. 33. But this cuts corners again. Determining the time and temperature was a key aspect of the invention that was directly related to whether the process as a whole would succeed, as Accord's own expert acknowledged. Appx5265 (Appel 233:6-9). In disregarding those limitations, the district court read the "heated air, without compression" limitation, Appx302 (cl. 1), in isolation—impermissibly assessing obviousness based on

"separate pieces of the claim," rather than the claimed invention "as a whole." *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1086 (Fed. Cir. 2008).

Tellingly, Accord does not actually defend—or even acknowledge—the district court's assumption of the claimed times and temperatures. Instead, Accord mischaracterizes Purdue's argument as a mere complaint about the court "sequentially address[ing]" the two gaps it found. Accord Br. 8, 12. But the problem is not the order of the court's analysis; it is the court's failure to analyze the correct *issue*—whether there was a reasonable expectation of success in making the "claimed invention *as a whole*." 35 U.S.C. § 103 (emphasis added).

Accord's cited case (at 13) confirms the district court's error. That case recognizes that it is permissible to analyze limitations sequentially "before considering the limitations *together*" in making the obviousness determination. *In re Copaxone Consol. Cases*, 906 F.3d 1013, 1027 (Fed. Cir. 2018) (emphasis added). That last step—"considering the limitations *together*"—is critical, and is precisely what the district court failed to do here. That failure was especially damaging because the claim limitations are closely interrelated and *together* reflect a novel process that had never before been used to harden PEO-based tablets, much less those containing extended-release oxycodone.

Accord's revisionist defense of the district court's reasoning fares no better. Armed with the court's conclusory reference to "Dr. Appel's credible testimony,"

Accord seeks to marshal all of the testimony that the court arguably could have considered, even when the court did not reference it. Accord Br. 15-16. But that testimony merely confirms that Accord never directly addressed the novelty of sequential compression and heating—instead, Dr. Appel focused narrowly on the heating tool and then separately on times and temperatures associated with the distinct processes and substances of the prior art. *Id.* And Dr. Appel's concessions on cross-examination about the missing steps in the prior art—including that the oven art was not directed to abuse deterrence, opioid formulations, PEO, or even heating any polymer above its melting point—further undercut the idea that a POSA would have a reasonable expectation of success. *See* Purdue Br. 20; *see also* Appx5320-5321 (287:23-288:21) (heat transfer in an oven is "definitely different" from heating process of McGinity).

Finally, the district court also erred in relying on a generic reference to a tablet being subject to "subsequent exposure to heat" in Bartholomaus to find that a POSA would have a reasonable expectation of success in heating PEO tablets without compression. Appx16 (citation omitted); Purdue Br. 42-44. Again, Accord attempts to disclaim the court's reasoning, arguing that the Bartholomaus statement was not "the basis for the court's finding" or "critical" to it. Accord Br. 27. That is plainly wrong. The court specifically determined that the Bartholomaus statement was "sufficient" to support a POSA's expectations. Appx16-17.

In fact, although Accord now asserts that the "basis" of the court's finding was instead "Dr. Appel's testimony," Accord Br. 27-28, that testimony itself rested on the same generic Bartholomaus statement. For example, when asked whether Bartholomaus is limited to simultaneous compression and heating, Dr. Appel pointed to "Paragraph 67" of Bartholomaus to show that the prior art "contemplates making [tablets] either with preceding, simultaneous, or subsequent exposure to heat." Appx5259 (227:17-23). And when asked on cross-examination whether Bartholomaus taught the curing process of the claimed patents, Dr. Appel again retreated to "Paragraph 67" and its reference to subsequent exposure to heat—contradicting her earlier testimony that Bartholomaus and the asserted patents "are not the same" because one involves "simultaneous compression or pressure and heat" while the other involves "air curing by heated air without compression." Appx5302-5304 (270:20-272:15); *see also* Appx5281 (249:18-20).

Accord emphasized the same generic statement in both its opening statement and closing argument at trial. Appx5046 (14:5-10); Appx5748 (715:22-25). But as Purdue explained, Bartholomaus's passing mention of "subsequent exposure to heat" is completely untethered to opioids, PEO, or any specifics that could provide a POSA a reasonable expectation of success with respect to the *claimed* invention. Purdue Br. 42-44. This is, again, hindsight in plain view.

Because Accord largely abandons its reliance on Bartholomaus's reference to subsequent heat, Accord now makes much of a *different* part of Bartholomaus: an example that purportedly showed heating of loose powder *before* it was compressed into a tablet. *See* Accord Br. 20, 27, 29. But there is no mention of that ambiguous example in the district court's opinion, much less any factual finding as to its meaning. Nor is there any mention of it in Accord's post-trial briefing or proposed findings of fact. *See generally* Appx2451-2472; Appx2542-2588. So this argument is waived. *See In re Watts*, 354 F.3d 1362, 1368 (Fed. Cir. 2004) ("new argument regarding the scope of the [prior art]" was "waived").

But even if the argument were not waived, the example does not help Accord. The example involves "pre-heat[ing]" *powder* rather than subsequently heating an already formed *tablet*. Appx5302 (Appel 270:2-18). That difference is significant. The process in the asserted claims was novel because it was believed that, absent simultaneous compression, PEO would soften or melt, deforming the tablet. Appx5265 (Appel 233:6-9); Appx5353-5354 (Mannion 320:10-321:5). Pre-heating a powder that has no form or shape says nothing about whether heating an already formed tablet would cause it to lose its shape or alter its dissolution profile.

Accord suggests (at 21 n.3) the district court properly discounted the concerns about heating PEO tablets without compression in favor of Dr. Appel's testimony. But Dr. Appel *never* addressed those concerns—to the contrary, she confirmed that

heating PEO tablets at too high a temperature could degrade the drug, degrade the polymer, or cause loss of tablet structure, turning them into "a puddle." Appx5265 (Appel 233:6-9). And even the district court acknowledged that it was "possible that heating tablets without simultaneously compressing them could change their properties" or that "applying heat with an oven … would simply not work." Appx17. It simply found that *Purdue* had not persuasively shown that "a POSA could not still reasonably expect the process to produce hardened tablets." Appx17. But it was *Accord*'s burden to affirmatively show that a POSA *would* reasonably expect success. Neither Bartholomaus's generic reference to subsequent heating, nor its mention of pre-heating powder, provides any basis for a POSA to reasonably expect success with a different, untested process.

#### 2. The District Court's Reliance On "Routine Experimentation" For The Time And Temperature Limitations Was Also Legal Error

The district court also inappropriately invoked the legal principle of "routine experimentation" to account for the time and temperature claim limitations. Purdue Br. 45-46. Accord concedes that routine experimentation applies only where "the general conditions of a claim are disclosed in the art," Accord Br. 30 (citation omitted), but it incorrectly contends that requirement is satisfied here.

Specifically, Accord contends the temperatures were "known" because the claimed ranges overlap with certain examples in Bartholomaus. *Id.* at 30-31. But

Bartholomaus discloses a process that uses simultaneous (as opposed to subsequent) compression—*i.e.*, that does not have the same "general conditions"—and thus does not pose the same risks as uncompressed heating. *See* Appx5353-5354 (Mannion 320:10-321:5) (deformation; dissolution rate); Appx5265 (Appel 233:6-9) (puddling). Similarly, Accord asserts (at 31) that "the general time range was known" from the oven art. But the oven art addressed *different*, amorphous polymers heated below their melting points, incorporating *different* drugs for *different* purposes. *See* Purdue Br. 20; Appx5320-5321 (Appel 287:23-288:21).

Routine experimentation does not apply where the only conditions disclosed in the art involve entirely different processes or substances—indeed, if that were the case, *any* art that disclosed heating PEO at its melting point would suffice, no matter the surrounding limitations. That is not the law. Instead, routine experimentation applies only where the general conditions are already disclosed such that the inventors need only "optimize" the variables. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012); Purdue Br. 45. Here, no prior art disclosed compressing polymer matrix tablets (much less PEO tablets), followed by heating them above their melting point without compression, such that only the time and temperature would remain to be determined. And in fact, the oven art used temperatures *below* the melting point of their polymers. As a matter of law, this glaring gap in the prior art precludes reliance on routine experimentation.

### C. The District Court Erred In Dismissing The Compelling Objective Indicia Of Non-Obviousness

The district court also erred in its analysis of the objective indicia of non-obviousness. First, the district court erred in reaching the objective indicia only *after* it concluded that Accord "presented clear and convincing evidence the patents are obvious." Appx19; *see* Purdue Br. 47-48. Accord tries to dismiss this error (at 33-34), but this Court has long prohibited such an approach. Purdue Br. 47-48 (citing cases). Moreover, the district court's failure to consider the objective indicia collectively also runs afoul of this Court's case law. *See, e.g.*, *Volvo Penta of the Ams., LLC v. Brunswick Corp.*, 81 F.4th 1202, 1215-16 (Fed. Cir. 2023) (vacating obviousness determination where the Board did not consider objective indicia collectively). In any event, the district court also legally erred—or, at a minimum, committed clear error—in its evaluation of each factor.

#### 1. The District Court Misevaluated Commercial Success

Reformulated OxyContin® had unquestioned commercial success. Purdue Br. 48. The district court improperly discounted that success by (1) attributing it to Purdue's "existing monopoly" and (2) reasoning that "a lack of commercial failure is not the same as commercial success." Appx23. It erred in both respects.

Indeed, Accord concedes that Purdue had no "monopoly" or blocking patent that barred others from developing abuse-deterrent formulations. Accord Br. 35. Instead, it suggests the court's reference to "monopoly" is "properly understood to

mean Purdue's dominant position in the market." *Id.* at 35 n.5. There is no basis to adopt Accord's spin on this issue. "Monopoly" is a well-known legal term, and the district court specifically recited the rule that commercial success is not probative when "others are '*legally barred* from commercially testing' the ideas of the claimed invention." Appx22 (emphasis added) (quoting *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1377 (Fed. Cir. 2005)). There was no such legal bar here.

But even under Accord's reading, Purdue's *prior success* in the market is not a sufficient basis to discount this factor. *PPC Broadband, Inc. v. Corning Optical Commc'ns RF*, 815 F.3d 734, 747 n.3 (Fed. Cir. 2016) ("[I]t would be wrong to conclude that a product with a high market share is not commercially successful *solely* because it is replacing a similarly successful earlier version of the product produced by the same company."); *ClassCo., Inc. v. Apple, Inc.*, 838 F.3d 1214, 1222 (Fed. Cir. 2016) ("blanket dismissal" of evidence showing even "limited[] commercial success" was "error" where "products embodied the claimed features"). That is particularly true, given that the abuse of opioids presented both a grave threat to Purdue's continued success and a commensurate opportunity for any other company that introduced an abuse-deterrent product. That Purdue did so first while others failed is strong evidence of non-obviousness. *Infra* at 22-23.

Accord also suggests (at 37-38) that the abuse-deterrent patents did not "dr[i]ve sales" as compared to the prior art disclosing other abuse-deterrent

formulations. Again, Accord is just attempting to re-write the district court's decision. This rationale appears nowhere in the opinion, and it makes no sense. By Accord's own telling (at 4), the prior art disclosed only *non-scalable* processes unfit for market. By contrast, Purdue developed a novel and scalable process that preserved the extended-release profile of OxyContin while introducing critical abuse-deterrent features. It then incorporated that technology into reformulated OxyContin—and preserved the product's commercial success in a competitive market. That undeniable commercial success weighs strongly against obviousness.

### 2. The District Court Misevaluated Failure Of Others

The district court also erred in disregarding the failures of others in attempting to develop abuse-deterrent products, including Accord's efforts through Intas Pharmaceuticals and Endo Pharmaceuticals' efforts with Opana®, which itself precludes a conclusion of obviousness. Purdue Br. 54-57.

First, the court found that Accord's failures did not matter because its "production failures … seem[ed] to weigh in favor of the production-scale-based motivation to combine" the court had found. Appx25. Once again, Accord does not defend the court's reasoning. *See* Accord Br. 41-42. Instead, Accord proffers a different reason to reach the same result: that Accord failed to achieve "the proper extended-release dissolution profile" and the dissolution profile is not a limitation of the claims. *Id.* But failing to achieve the proper extended-release dissolution profile

meant that Accord could not develop a commercially viable product—until, of course, Accord gave up and copied Purdue's invention. That failure weighs against obviousness because it directly undermines a reasonable expectation of successfully achieving commercial-scale manufacture—the key goal the court found that a POSA would seek to achieve.

Second, as to Opana, Accord again does not defend the district court's clearly erroneous finding that Grunenthal was "satisfied with the results of its manufacturing process" even though the product was withdrawn from the market. Appx26. Instead, Accord emphasizes the court's statement that "the record is not clear on why Opana was removed from the market." Appx25. But neither the evidence nor Accord's citations support that finding. Instead, it is clear that Opana was pulled from the market because it was insufficiently abuse-deterrent. *See* Purdue Br. 56-57. Again, that weighs heavily against obviousness.

### 3. The District Court Misevaluated Skepticism

Purdue also showed that FDA was skeptical that reformulated OxyContin would actually deter abuse. Purdue Br. 52-54. But the district court simply dismissed that skepticism because FDA was "not in the industry" and "this was the first extended-release opioid to receive abuse-deterrent labelling." Appx24.

Again, Accord does not defend the district court's reasoning. It does not dispute that FDA's skepticism can be legally relevant even though FDA is not a drug

manufacturer. Nor does it contend that the law somehow discounts skepticism of a novel product. Instead, Accord proffers an entirely new justification, suggesting that FDA's skepticism does not matter because FDA was not skeptical "that the claimed invention … could be made" and because the claimed invention contains "no limitations requiring … FDA approval." Accord Br. 39. But that is not the law. Just as "skepticism regarding the efficacy" of a drug product and the corresponding "potential for FDA approval" is relevant, *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1291-92 (Fed. Cir. 2013), so too is the potential for obtaining an abuse-deterrent label. FDA's undenied skepticism on that is directly relevant.

#### 4. The District Court Misevaluated Unexpected Results

Finally, the unexpected decrease in density was also compelling evidence of *non*-obviousness. Both parties and the district court *agreed* this was an unexpected property, and FDA itself identified gelling as a key component of reformulated OxyContin's abuse deterrence. Yet the district court found the evidence "in equipoise" as to whether the decrease in density was advantageous. Appx21-22. That finding was clearly erroneous. Purdue Br. 57-58.

## II. THE DISTRICT COURT ERRED IN HOLDING THE LOW-ABUK PATENTS OBVIOUS

The district court likewise erred in its assessment of the low-ABUK patents. Purdue identified both an unknown problem (reappearing 14-hydroxy) and the

source of that problem (the previously unknown impurity 8α). Together, those discoveries precluded a conclusion of obviousness as a matter of law.

*First*, Accord concedes that "[w]here a problem is entirely unknown, there may be no motivation to solve it," and thus the solution cannot be obvious. Accord Br. 47. But it attempts to avoid that rule by focusing on the known problem of high levels of 14-hydroxy. That misses the point. Dr. Kupper—a highly experienced scientist—thought he had solved the problem of high levels of 14-hydroxy only to surprisingly discover that he had not, and that the real problem was the reappearance of 14-hydroxy. *See* Appx5509, Appx5533-5534 (476:11-16, 500:25-501:4). Purdue thus identified an entirely unknown, unique problem. *See, e.g.*, Appx5192 (Martin 160:15-20). A POSA would lack the motivation to innovate to resolve that problem, even assuming there was a general motivation to lower 14-hydroxy levels. And a POSA would likewise lack any reasonable expectation of success in doing so. *Cf. Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1377 (Fed. Cir. 2004) (distinguishing between "the general motivation to cure an uncured disease" and "the motivation to create a particular cure"). The district court erred in disregarding that crucial fact. Purdue Br. 59-63; *see also, e.g.*, *In re Nomiya*, 509 F.2d 566, 572 (C.C.P.A. 1975) ("[I]t is not proper to conclude that the invention which solves [an unknown] problem … would have been obvious.").

*Second*, the case for non-obviousness was even stronger here, because Purdue also identified the *source* of the problem of reappearing and persistently high levels of 14-hydroxy—8α. Again, Accord concedes that discovery of an "unknown source of a problem" may defeat obviousness, but it suggests that is true only if the field has first struggled to solve the problem. Accord Br. 48. But the case law has long recognized that, where the "crux of the matter is the discovery … of the cause of a problem," "the determinative question is whether that cause would have been recognized by one of ordinary skill in the art at the time the invention was made." *In re Peehs*, 612 F.2d 1287, 1290 (C.C.P.A. 1980); *see also, e.g.*, *Eibel Process Co. v. Minn. & Ontario Paper Co.*, 261 U.S. 45, 68 (1923); *In re Sponnoble*, 405 F.2d 578, 585 (C.C.P.A. 1969). Discovery of an unknown source of a problem is thus significant regardless of whether there are also additional factors—such as "real world failure[s]," Accord Br. 49—that weigh in favor of non-obviousness.

Even on its own terms, Accord's attempt to narrow the case law to circumstances where the field has struggled to solve a problem does not help Accord. Here, the impurities associated with 14-hydroxy, including 8β, had been known and studied for decades—but no one had discovered 8α. *See, e.g.*, Appx1810-1811 (¶¶ 72-73, 81-83) (prior art disclosed 8β in 1957). Noramco even took years to develop low-ABUK oxycodone *after* Purdue published its discovery of 8α and its attributes, further confirming the asserted claims' non-obviousness. Purdue Br. 18;

*see also* Appx5581-5584 (548:3-551:16) (Noramco recognized that achieving less than 10 ppm 14-hydroxy was a significant challenge). Nor does Accord's passing reference (at 55-56) to inventions by the Casner group change the calculus. The district court did not mention that evidence, and separate inventions do not undermine Purdue's undisputed discovery of 8α, as reflected in the asserted claims. *Eibel*, 261 U.S. at 69 (observing that whether "others can do what [the patentee] accomplished in another way" does not "in any way affect the validity of the [asserted] patent").

Accord also contends that the district court properly discounted Purdue's discovery of 8α because a POSA would not have needed to discover 8α to lower 14-hydroxy levels. Accord Br. 53-54. That determination rests on the district court's erroneous view that because 8α was inherent in the composition, it had to be obvious. Purdue Br. 62. Accord attempts to disclaim that rationale while at the same time arguing that, in the course of seeking to eliminate 8β, a POSA would "inherently and necessarily" remove any 8α. Accord Br. 54. As Purdue explained, that does not show obviousness. Indeed, as this Court has explained, that which "'may be inherent is not necessarily known' and that which is unknown cannot be obvious." *Honeywell*, 865 F.3d at 1354 (citation omitted).

Nor is there any other factual basis to conclude that the discovery of 8α was unnecessary. The evidence showed that the inventors used their discovery of 8α and

its unusually high reactivity to develop the patented processes of making very pure oxycodone with 14-hydroxy levels less than 10 ppm and 8α levels less than 0.04%. Appx5520-5522 (Kupper 487:9-489:17); Appx5627 (Wuest 594:10-25) ("significant differences between what the inventors did and what had been done in the prior art" "reflect an understanding of the reactivity of 8-alpha, in addition to its presence"); Appx5618, Appx5624, Appx5626 (Wuest 585:1-18, 591:10-25, 593:13-25) (replicating the processes of the prior art, which did not know about 8α, would not have led to the <10 ppm levels of 14-hydroxy). The district court itself found that "8α's surprising reactivity made it *a surprisingly important component of the solution* to lowering 14-hydroxy." Appx47 (emphasis added). Accord's argument that the claimed invention could have been developed *without* knowledge of 8α, which is specifically identified in the asserted claims, is both wrong and the product of impermissible hindsight.

Accord tries to shift the focus by claiming that Purdue argues for an "iron clad rule of non-obviousness" that conflicts with *KSR*. Accord Br. 50. Purdue seeks no such rule. Purdue merely argues that, under this Court's decisions, the particular facts of this case—involving both discovery of an unknown problem and discovery of an unknown source—preclude an obviousness conclusion. Purdue Br. 60. But in any event, Accord understates the weight the law affords to novel discoveries of unknown problems—whether or not there is an "iron clad" per se rule of non-

obviousness, such discoveries weigh strongly against a legal conclusion of obviousness. *See, e.g.*, *Novartis Pharms. Corp. v. Watson Laboratories, Inc.*, 611 F. App'x 988, 996 (Fed. Cir. 2015) ("Without the knowledge of a problem, one of skill in the art *would not have been* motivated to modify" the prior art as the inventor did. (emphasis added)); *Leo*, 726 F.3d at 1356-57 (where the problem was not known, "the claimed invention would not have been obvious to try" because "ordinary artisans" "would not have recognized the problem"); *In re Linnert*, 309 F.2d 498, 503 (C.C.P.A. 1962) ("[T]he determination of the cause" of the problem "makes the invention here claimed unobvious."). The district court thus erred in dismissing evidence of Purdue's discoveries.

Finally, Accord invokes cases related to prior low-ABUK patents—again offering a rationale upon which the district court did not rely. Accord Br. 51, 55 n.10; *see* Appx10 n.2. But those cases support Purdue here. *See* Purdue Br. 61 n.5. In *In re OxyContin Antitrust Litigation*, the court noted that "with its knowledge of 8α Purdue had the capability to practice its claims in a way that would have been nonobvious … by *tailoring them to 8α*." 994 F. Supp. 2d 367, 403, 405, 407 (S.D.N.Y. 2014) (emphasis added), *aff'd sub nom. Purdue Pharma L.P. v. Epic Pharma, LLC*, 811 F.3d 1345 (Fed. Cir. 2016). And Purdue did just that. It specifically tailored its new claims to 8α by reciting "removing [8α]" (for the process claims) and certain levels of 8α (for the product claims). Accord's attempt (at 51)

to rely on this Court's statement from another case that "the source of 14-hydroxy … did not need to be solved to arrive at the claimed invention" is thus misplaced. That was true solely because the asserted claims there recited 8α (if at all) only as product-by-process limitations not considered in an obviousness analysis. *Epic Pharma*, 811 F.3d at 1352-54 (emphasizing that Purdue claimed only "the end product" and not "a particular method for creating that product"). Here the asserted claims recite 8α in both the product claims and the process claims in ways that *are* relevant to the analysis. *See Purdue Pharma L.P. v. Collegium Pharm., Inc.*, 335 F. Supp. 3d 149, 169-70 (D. Mass. 2018) (recognizing that "[t]he presence of 8α in a process claim could … render the claim nonobvious" and that including "the step of 'removing 8α' may materially affect" the validity analysis as compared to prior low-ABUK patents). That Purdue did precisely what prior cases suggested it should confirms that the low-ABUK patents, developed through Purdue's novel discoveries of reappearing 14-hydroxy and 8α, are not obvious.

## CONCLUSION

The district court's judgment should be reversed.

Dated: November 1, 2023

Respectfully submitted,

*<u>/s/ Gregory G. Garre</u>*

Gregory G. Garre
Margaret A. Upshaw
Alexander G. Siemers
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

David F. Kowalski
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

Pablo D. Hendler
POTOMAC LAW GROUP, PLLC
1177 Avenue of the Americas
5th Floor
New York, NY 10036
(914) 893-6883

Daniel G. Brown
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Gregory A. Castanias
Jennifer L. Swize
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3639

John J. Normile
Gasper J. LaRosa
JONES DAY
250 Vesey Street
New York, NY 10281-1047
(212) 326-3939

*Counsel for Plaintiffs-Appellants*
*Purdue Pharma L.P.,*
*Purdue Pharmaceuticals L.P.,*
*Rhodes Technologies*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Circuit Rule 32(b)(3) and Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that the foregoing Reply Brief of Plaintiffs-Appellants complies with the type-volume limitations in Federal Circuit Rule 32(b)(1), because it contains 6,963 words, excluding the exempted parts under Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief was prepared using Microsoft Word 365 in 14-point Times New Roman font.

*/s/ Gregory G. Garre*
Gregory G. Garre